*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 49**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

WITTINGHAM, LLC; THE MUIR SECOND FAMILY LIMITED
PARTNERSHIP; and DOROTHY JEANNE MUIR,
*Appellees/Cross-appellants,*

*v.*

TNE LIMITED PARTNERSHIP,[1]
*Appellants/Cross-appellees.*

No. 20190220
Heard February 12, 2020
Filed July 15, 2020

On Direct Appeal

Second District, Farmington
The Honorable Robert J. Dale
No. 090700547

Attorneys:

James K. Tracy, Stacy J. McNeill, Joshua L. Lee, Salt Lake City,
for appellees/cross-appellants

Jeffrey L. Silvestrini, Bradley M. Strassberg, Salt Lake City,
for appellants/cross-appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS,
JUSTICE PEARCE, and JUSTICE PETERSEN joined.

---

[1] Gavin Dickson; Bruce J. Malcom, individually and as Trustee of the Bruce J. Malcolm Trust; Maureen H. Malcolm, Trustee of the Maureen H. Malcolm Trust; Daniel J. Torkelson, trustee; William Nicholas Muir; Trump Security LLC; Mario Ozuna; Dwight Egan; Michael Snow; Brett Candiotti; Tod Debie; Ashton Gifford; Juliana Keller; Mario Naujoks; and Stephen Hawkes.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1    We are asked to determine whether a contract entered into by a dissolved partnership is void or merely voidable. This distinction is important because, among other reasons, "a contract or a deed that is void cannot be ratified or accepted," while "a contract or deed that is voidable may be ratified at the election of the injured party."[2]

¶2    Two years after the Muir Second Family Limited Partnership (the Muir Partnership or Partnership) was administratively dissolved, Nicholas Muir—the former general partner of the Muir Partnership—obtained a loan from the TNE Limited Partnership (TNE). Mr. Muir obtained the loan, which he secured through a trust deed, ostensibly to remove an encumbrance on apartments owned by the dissolved Partnership. But the encumbrance was, in fact, part of a fraudulent scheme to obtain title to the apartments.

¶3    Once the scheme was discovered, Wittingham, LLC, a successor-in-interest to the Muir Partnership, brought suit to declare the trust deed void and recover damages for the fraudulent scheme. The district court held that the trust deed was void because the Muir Partnership had been dissolved prior to the time Mr. Muir signed the trust deed, and dismissed TNE's counter-claims against Wittingham, LLC and cross-claims against Mr. Muir.

¶4    Both TNE and Wittingham, LLC appeal. TNE appeals the district court's determination that the TNE trust deed is void and the court's dismissal of TNE's remaining claims. Wittingham, LLC cross-appeals, arguing that the district court erred in finding that Mr. Muir was competent and that he intended to bind the dissolved Partnership when he entered into the TNE transaction. And finally, Wittingham, LLC claims it was entitled to attorney fees under the TNE trust deed as the prevailing party.

## Background

¶5    The Muir Partnership was organized on December 30, 1993, and continued until it was administratively dissolved on May 3, 2007. Two years after dissolution, Nicholas Muir, the former

---

[2] *Ockey v. Lehmer*, 2008 UT 37, ¶ 18, 189 P.3d 51.

general partner of the defunct Partnership, obtained a loan for $435,000 from TNE. To secure the loan, Mr. Muir issued a promissory note to TNE, which was secured by a trust deed on a pair of apartment buildings owned by the Partnership. Prior to the execution of the TNE trust deed, Mr. Muir did not disclose to TNE that the Muir Partnership had been administratively dissolved. Instead, he created and registered a second entity: "Muir Second Family Limited Partnership" (second partnership). The only difference between the names of the two partnerships is that the name of the second partnership is missing the definite article "the."[3]

¶6    In his negotiations with TNE, Mr. Muir asserted that the loan was necessary to remove an existing encumbrance on the apartments. That existing encumbrance was another trust deed, which secured a promissory note payable to Trump Security LLC. In fact, the purported purpose of the TNE transaction was a sham. There was no promissory note payable to Trump Security nor was there a valid trust deed. And the sole member of Trump Security was Gavin Dickson, who assisted Mr. Muir in his scheme. Mr. Muir apparently agreed to the sham encumbrance in order to obtain funds to repair the apartments.

¶7    After TNE disbursed the funds, the sham encumbrance was released. Mr. Dickson, acting on behalf of Trump Security,[4] then directed that the TNE funds be used for purposes that did not benefit the Partnership. When Mr. Muir's family discovered the sham encumbrance and misappropriation of the TNE funds, Wittingham, LLC, the Muir Partnership, and Dorothy Jeanne Muir (collectively, Wittingham) commenced this action, seeking to have the TNE trust deed declared void.

¶8    Wittingham asserted that the TNE trust deed was void because (1) the transaction was not for the purpose of winding up

---

[3] Under the 2009 Utah Revised Uniform Limited Partnership Act, which applied at the time this suit commenced and has since been repealed and replaced, "the presence or absence of the word[] 'the'" is "not distinguishing." UTAH CODE § 48-2a-102(6)(c) (2009).

[4] Wittingham asserted claims against Mr. Dickson and Trump Security (collectively the Trump defendants). It obtained a default judgment against the Trump defendants, a judgment which is not challenged on appeal.

Partnership affairs and (2) Mr. Muir was incompetent, as the result of a head injury, when he entered into the TNE transaction. Wittingham also sought to recover damages from TNE, Trump Security, and Mr. Dickson for civil conspiracy due to their roles in the fraudulent scheme. Wittingham obtained a default judgment against Mr. Muir, who transferred his partnership interest to plaintiff Jeanne Muir to satisfy the judgment. After the transfer of Mr. Muir's partnership interest, the Muir family made a series of transactions transferring title to the apartment buildings among successive business entities, the last being Wittingham, LLC.

¶9    In response, TNE filed counter-claims against Wittingham asserting that the TNE trust deed was valid and that the Muir Partnership was bound by the agreement.[5] It also raised various cross-claims against Mr. Muir personally, including fraud, estoppel, and breach of warranty in his individual capacity and as general partner of the Muir Partnership. It claimed that the transfer of Mr. Muir's partnership interest to Jeanne Muir, and the subsequent transfer of title of the apartments to various entities owned by Jeanne Muir, was fraudulent and part of a civil conspiracy to prevent TNE from collecting damages against Mr. Muir and the Muir Partnership. In the alternative, TNE argued that the Muir Partnership was unjustly enriched when it retained the benefit of the $435,000.

¶10  After a bench trial, the district court found that Mr. Muir was competent when he entered into the TNE transaction. It further found that Mr. Muir entered into the transaction on behalf of the Muir Partnership, not the second partnership. But it concluded that the TNE trust deed was void *ab initio*, rather than voidable. The district court reasoned that, because Mr. Muir's dealings with TNE were not acts performed for the purpose of winding up Muir Partnership affairs, the TNE trust deed was an illegal contract and thus void. Because the court declared the trust deed void, it dismissed all but one of TNE's counter-claims — a counter-claim for unjust enrichment.

¶11 The court determined that Wittingham was unjustly enriched by a small portion of the funds that were used to pay various tax and utility liens on the apartments, thereby benefitting the Partnership. Additionally, on its own initiative, the court

---

[5] In the alternative, TNE requested that the court reform the trust deed to "show the Partnership as the Trustor."

dismissed the cross-claims that TNE asserted against Mr. Muir because TNE failed to serve Mr. Muir under Utah Rule of Civil Procedure 4.

¶12 After trial, Wittingham sought attorney fees under the Reciprocal Fee Statute. The court denied this request because it determined that the TNE trust deed did not provide for attorney fees and held that Wittingham was not a "prevailing party" under the fee statute. Both Wittingham and TNE appealed.[6] We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

**Standards of Review**

¶13 TNE challenges the district court's determination that the TNE trust deed was void. This is a legal question, "which we review for correctness, giving no deference to the trial court's determination on the matter[]."[7] It also challenges the district court's determinations that (1) the court lacked personal jurisdiction over Mr. Muir because TNE failed to properly serve him under Utah Rule of Civil Procedure 4 and (2) Mr. Muir did not waive an objection to insufficient service of process by filing a responsive pleading or making an appearance in the proceedings. When a "jurisdictional decision has been made on documentary evidence only, an appeal from that decision presents only legal questions that are reviewed for correctness."[8] We review for clear

---

[6] This is the parties' second appeal in this case. The court of appeals issued an opinion on the matter in 2016. *Wittingham, LLC v. TNE Ltd. P'ship*, 2016 UT App 187, 380 P.3d 397. TNE appealed the court of appeals decision, in which it affirmed that the TNE trust deed was void, and we granted certiorari. But we determined we did not have appellate jurisdiction because the district court failed to issue a final judgment as to all parties and all claims. As a result, we vacated the court of appeals decision and dismissed the appeal. *Wittingham, LLC v. TNE Ltd. P'ship*, 2018 UT 45, ¶ 23, 428 P.3d 1027. After remand, the district court entered a final judgment as to all claims and all parties. We then granted TNE's request that we retain the direct appeal.

[7] *Hi-Country Estates Homeowners Ass'n v. Bagley & Co.*, 2008 UT App 105, ¶ 8, 182 P.3d 417.

[8] *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 8, 201 P.3d 944 (citation omitted) (internal quotation marks omitted).

error any factual determinations to support a jurisdictional conclusion.[9]

¶14 On cross-appeal, Wittingham argues the court erred in determining that Mr. Muir was competent at the time he entered into the TNE transaction. We review for clear error the district court's "specific findings of fact" underlying its determination that Mr. Muir was competent.[10] A factual finding is clearly erroneous if it is "against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made."[11] And when the factual findings lead to a district court's "ultimate legal conclusion[]" of competency, we review this conclusion for correctness.[12]

¶15 Wittingham also challenges the district court's determination that Mr. Muir intended to bind the Muir Partnership, and not the second partnership, when he entered into the TNE transaction. "Determining whether a contract is ambiguous presents a threshold question of law, which we review for correctness."[13] And once a contract is found ambiguous and the district court considers extrinsic evidence to determine its meaning, this "generally presents questions of fact" which we review for clear error.[14]

¶16 Wittingham also argues that it was entitled to attorney fees under the Reciprocal Fee Statute, Utah Code section 78B-5-826 because (1) provisions in the TNE trust deed provided for attorney fees and (2) it was the prevailing party in the matter. Whether a contract provides for attorney fees is a question of law that we review for correctness.[15] And we review a district court's

---

[9] *D.A. v. State* (*State ex rel. W.A.*), 2002 UT 127, ¶ 8, 63 P.3d 607.

[10] *Montes Family v. Carter* (*In re Estate of Ioupe*), 878 P.2d 1168, 1171 (Utah Ct. App. 1994).

[11] *State v. Walker*, 743 P.2d 191, 193 (Utah 1987).

[12] *In re Estate of Ioupe*, 878 P.2d at 1171.

[13] *Interwest Constr. v. Palmer*, 923 P.2d 1350, 1358 (Utah 1996).

[14] *Id.* at 1359.

[15] *See Brady v. Park,* 2019 UT 16, ¶ 29, 445 P.3d 395.

determination that there was no prevailing party in the matter for an abuse of discretion.[16]

**Analysis**

¶17 The parties raise multiple issues on appeal and cross-appeal. Although TNE raises eight issues on appeal, we address only two because our decisions on those issues are dispositive. First, TNE argues that, under the test we recently established in *Ockey v. Lehmer*,[17] the district court erred in determining that the trust deed was void, and not voidable.[18] We agree. Under the rule we established in *Ockey*, the trust deed is presumed voidable—a presumption that can be rebutted only through a showing free from doubt that the contract is against public policy. Because we hold that the TNE trust deed is voidable, we reverse and remand to the district court for further proceedings.

¶18 Second, TNE argues the district court erred in declaring, on its own initiative, that it lacked personal jurisdiction over Mr. Muir. The court determined that Mr. Muir was not served under rule 4 of the Utah Rules of Civil Procedure and thus was not a proper party. And because it concluded he was a necessary and indispensable party under rule 19 of the Utah Rules of Civil Procedure, the court dismissed TNE's claims fraudulent transfer claims. According to TNE, this was error because Mr. Muir waived any objection to improper service of process. We agree. Although TNE failed to properly serve Mr. Muir, he failed to assert the affirmative defense of improper service of process before or during trial. And so Mr. Muir waived any objection under rule 4, and the district court had jurisdiction over him. As a result, we reverse the court's decision on this issue and remand for further proceedings.

¶19 On cross-appeal, Wittingham raises three issues. First, it argues the district court erred in finding that Mr. Muir was

---

[16] *See R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119.

[17] 2008 UT 37, 189 P.3d 51.

[18] Although the district court did not rule on TNE's remaining claims because it determined that the contract and trust deed at issue was void, TNE nevertheless argues that we can resolve those remaining claims in TNE's favor on appeal. We disagree. Instead, we remand the case so that the parties can litigate any remaining claims.

competent at the time he entered into the TNE transaction. We hold that the district court did not err on this point.

¶20 Second, Wittingham argues the district court erred in finding that Mr. Muir intended to bind the Muir Partnership, rather than the second partnership. We hold that the district court did not err on this point. The court properly considered extrinsic evidence because the contract was ambiguous as to the identity of the grantor and did not err in concluding the Muir Partnership was the intended grantor.

¶21 Finally, Wittingham argues it was entitled to attorney fees under the Reciprocal Fee Statute as the prevailing party. We decline to address the merits of this argument because we otherwise reverse the district court and remand for further proceedings.

I. The District Court Erred in Declaring the TNE Trust Deed Void

¶22 First, we address TNE's argument that the district court erred in declaring the trust deed void rather than voidable. "The distinction between void and voidable" is critical.[19] Although a void contract "cannot be ratified or accepted," a voidable contract may either be "ratified" or "set . . . aside" "at the election of the injured party."[20] TNE argues that under the test we laid out in *Ockey v. Lehmer*,[21] the TNE trust deed is voidable, not void. We agree.

---

[19] *Ockey v. Lehmer*, 2008 UT 37, ¶ 18, 189 P.3d 51.

[20] *Id.*

[21] *Id.* ¶ 21. In advancing this argument, TNE asks that we clarify a conflict between our 1919 decision in *Houston v. Utah Lake Land, Water & Power Co.*, 187 P. 174 (Utah 1919), and our decision in *Ockey*. In *Houston*, we held that a contract was "wholly void" because a "defunct corporation" no longer had the "power" and "authority" to transact new business. 187 P. at 177. But in *Ockey*, we determined that contracts entered into by trustees of a terminated trust are presumed voidable—a presumption that can be rebutted by a "showing free from doubt that the contract is against public policy." 2008 UT 37, ¶ 21 (citation omitted). So our decision in *Ockey* conflicts with our decision in *Houston* as to whether a contract between a third party and an administratively dissolved limited partnership is void or presumed voidable.

(Continued)

¶23 In *Ockey*, we determined that the conveyance of trust property was voidable even though the trustees who conveyed the property lacked authority (because the trust had terminated eight years before).[22] We held that "[i]n determining whether [contracts are] void or voidable, we start with the presumption that [they] are *voidable* unless they clearly violate public policy."[23] This presumption arises from the principle that parties have "the freedom to contract."[24] Consistent with this principle, courts must "employ 'any reasonable construction' to declare contracts 'lawful and not in contravention of public welfare.'"[25] For this reason, it is only where a party has made "a showing free from doubt that the contract is against public policy" that courts should hold contracts to be void.[26]

¶24 To help courts in determining whether a contract clearly violates public policy, we identified two factors: (1) whether the law or legal precedent has declared that the type of contract at issue is "unlawful" and "absolutely void,"[27] and (2) whether "the contract harmed the public as a whole—not just an individual."[28] In applying these factors in *Ockey*, we concluded that the unauthorized conveyance of the trust property was not void but "merely voidable because the trustee's actions were not contrary to

---

When subsequent case law "directly conflicts with" a prior holding, we consider such holding "implicitly overruled." *Bear River Mut. Ins. Co. v. Wall*, 1999 UT 33, ¶ 19, 978 P.2d 460. Because our decision in *Ockey* directly conflicts with our decision in *Houston*, we hold that the rule we established in *Ockey* implicitly overruled the rule we established in *Houston*.

[22] 2008 UT 37, ¶¶ 4–8, 11.

[23] *Id.* ¶ 21 (emphasis added).

[24] *Id.* ¶ 24.

[25] *Id.* ¶ 24 (citation omitted).

[26] *Id.* ¶ 21 (citation omitted).

[27] *Id.* ¶¶ 23 (quoting *Zion's Serv. Corp. v. Danielson*, 366 P.2d 982, 985 (Utah 1961)); *see also id.* ¶ 24. The law must provide a "clear" and "well-defined" public policy that the type of contract at issue is void. *Eagle Mountain City v. Parsons Kinghorn & Harris, P.C.*, 2017 UT 31, ¶¶ 15, 15 n.7, 408 P.3d 322.

[28] *Ockey*, 2008 UT 37, ¶ 23.

public policy and did not injure anyone other than [the plaintiff] himself."[29]

¶25 So, under our decision in *Ockey* there is a rebuttable presumption that defective contracts are voidable rather than void. This presumption can be rebutted only through a showing, "free from doubt," that the contract violates public policy. And, in considering whether a contract clearly violates public policy, courts should consider the two *Ockey* factors. Based on these rules, we conclude that the TNE transaction is voidable, not void.

*A. We conclude that the legislature has not declared the type of contract at issue in this case to be unlawful and absolutely void*

¶26 With the presumption of voidability in mind, we first consider whether the legislature has declared by statute that the type of contract at issue is "unlawful" and "absolutely void."[30] In reviewing a statute to determine whether it provides that a contract is void, we "apply the traditional rules of statutory construction," relying first on the statute's plain language.[31] If the plain language of the statute is ambiguous, we read the statute "in harmony with other statutes under the same and related chapters."[32]

¶27 Because the Muir Partnership is a "limited partnership" formed under the General and Limited Liability Partnerships Act (the Act), we review the Act to determine whether it provides a well-defined and dominant public policy supporting the conclusion that the type of contract at issue in this case is void.[33]

---

[29] *Id.* ¶ 20.

[30] *Id.* ¶¶ 23–24 (quoting *Zion's Serv. Corp.*, 366 P.2d at 985). A contract or deed can violate clear public policy based on statute or common-law principles. *Id.* ¶¶ 22–23. In the case at hand, Wittingham argues that the legislature has declared a clear public policy in the 2009 General and Limited Liability Partnerships Act supporting the conclusion that the TNE trust deed is void.

[31] *Arndt v. First Interstate Bank of Utah, N.A.*, 1999 UT 91, ¶ 10, 991 P.2d 584.

[32] *Id.* (citation omitted).

[33] Although the Act has since been repealed and replaced, the 2009 version of the Act was in effect at all relevant times during this

(Continued)

Under the Act, a limited partnership can act only through its agent, typically the general partner.[34] And the general partner has authority to bind the partnership by entering into agreements on the partnership's behalf.[35]

¶28 As with any agent, a general partner's authority to bind the partnership can be actual (as provided by statute or the partnership agreement) or apparent (as provided by statute and common-law agency principles).[36] The Act specifically identifies the scope of a general partner's actual authority by defining circumstances under which a general partner's actions will bind a partnership. And it grants a general partner "apparent authority" by incorporating common-law principles of agency—such as the "apparent authority" principle[37] and the principle of "[p]artner by estoppel"[38]—which may apply to render a general partner's acts enforceable even when those acts fall outside the scope of the general partner's actual authority.

¶29 And, importantly for this case, the Act specifically addresses the nature of a general partner's authority after a limited

---

case. We therefore consider the language of the 2009 version of the Act.

The Act includes three parts: the General Partnership Act, the Utah Limited Liability Act, and the Utah Revised Uniform Limited Partnership Act. All three parts apply to limited partnerships because a limited partnership is a general partnership that has followed the specific statutory registration requirements in order to become a distinct business entity, with many of the attributes of a corporation. *See Arndt*, 1999 UT 91, ¶ 13 (applying "corporate principles concerning derivative actions to limited partnerships").

[34] *See* UTAH CODE § 48-2a-403 (2009). Limited partners may act as agents of the limited partnership under certain circumstances, including when the general partner "wrongfully dissolved" the limited partnership. *Id.* § 48-2a-803 (2009).

[35] *Id.* § 48-2a-403 (2009); *see also Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 207 (Utah 1993).

[36] *See Luddington*, 855 P.2d at 207–09; *Zions Gate R.V. Resort, LLC v. Oliphant*, 2014 UT App 98, ¶ 6, 326 P.3d 118.

[37] UTAH CODE § 48-1-11 (2009).

[38] *Id.* § 48-1-13 (2009).

partnership has been dissolved.[39] Under section 48-1-30 of the Act, when a limited partnership has been dissolved, the general partner's authority to act on behalf of the limited partnership is limited to "wind[ing] up" the partnership's affairs.[40]

¶30 Relying on this section, the district court concluded that the Act provides a clear policy that partners may bind the partnership only in limited circumstances after dissolution. According to the court, Mr. Muir did not enter into the TNE

---

[39] Although dissolution may be triggered by an event specified in the Act, a limited partnership is "not terminated," and therefore continues in a limited capacity, until its affairs have been wound up. UTAH CODE § 48-1-27 (2009). But under Utah Code section 48-2a-203.5(7) (2009), when a limited partnership is involuntarily dissolved because it failed to file an annual report and did not cure the delinquency within sixty days, it "may not maintain any action, suit, or proceeding in any court of this state until it has reinstated its certificate or registration following dissolution." In other words, a limited partnership that has been administratively dissolved is barred from bringing suit until it has been reinstated. In this case, the parties stipulate that the Muir Partnership was administratively dissolved because Mr. Muir failed to file an annual report and did not cure the delinquency. But whether Jeanne Muir, as limited partner, could properly bring derivative claims on behalf of the Partnership has not been raised by the parties, and we do not address the effect it has on the outcome of this case. *See Uintah Basin Med. Ctr. v. Hardy*, 2002 UT 92, ¶ 13 n.2, 54 P.3d 1165 ("Since this issue was not raised below, we decline to address it.").

[40] UTAH CODE § 48-2a-801 (2009) (providing that once a "limited partnership is dissolved," "its affairs shall be wound up"). Although the Act does not define what transactions constitute "winding up" of the partnership's affairs, we have previously looked to the Revised Business Corporation Act's (RBCA) definition, *see Arndt*, 1999 UT 91, ¶ 13, which lists the following activities as winding-up activities: (1) "collecting [] assets;" (2) "disposing of . . . properties . . . ;" (3) "discharging . . . liabilities;" (4) "distributing . . . remaining property among . . . shareholders . . . ;" and (5) "doing every other act necessary to wind up and liquidate . . . business and affairs." UTAH CODE § 16-10a-1405(1).

transaction for the purpose of winding up the Partnership, so the transaction fell outside Mr. Muir's authority to act as the dissolved Partnership's general partner. For that reason it determined that the trust deed was an illegal contract and was therefore absolutely void. But unlike the district court, we are not convinced that section 48-1-30 leads to a conclusion "free from doubt that the contract is against public policy."[41]

¶31 Although the district court concluded that there was a clear public policy against allowing the type of contract at issue in this case to be formed, there are at least three places in the Act suggesting the existence of a public policy that is in direct conflict with the court's policy finding. First, section 48-1-32(1)(b) suggests the existence of a general public policy in favor of protecting third parties who unknowingly enter into contracts with dissolved partnerships. This section allows a general partner to bind the dissolved partnership to acts performed outside the course of winding up the partnership's business in certain situations where the other party to the transaction did not have notice of dissolution. Although the district court determined, for unspecified reasons, that this provision did not bind the Partnership in this case, the existence of this provision cuts against, and therefore casts doubt on, the public policy determination underlying the court's conclusion that the TNE transaction was void.

¶32 Second, section 48-1-13 of the Act incorporates the common-law principle of "[p]artner by estoppel," a principle that also aims to protect third parties. Under this principle, a partnership may be held liable when a person represents himself or herself as an agent of an "actual or apparent partnership" to a third party, and the third party extends credit as a result of the representation.

¶33 And third, section 48-1-11 provides that a partnership may be bound under the common-law agency principle known as "apparent authority."[42] That section provides that a "partnership is bound to make good the loss" when a "partner act[s] within the scope of his apparent authority [and] receives money or property

---

[41] *Ockey*, 2008 UT 37, ¶ 21.

[42] UTAH CODE § 48-1-11 (2009).

of a third person and misapplies it."[43] So, when a general partner's transaction is not within the general partner's actual authority, the limited partnership may still be bound under the doctrine of apparent authority.[44]

¶34 Although the court did not discuss whether the principles of "partner by estoppel" or "apparent authority" could have applied in this case, the Act's incorporation of those principles, together with the exception the Act creates in section 48-1-32(1)(b), suggests the existence of a general public policy in favor of protecting third parties who enter into a transaction with a dissolved partnership without knowledge of the dissolution. Because these provisions cut against the public policy identified by the district court, we conclude that the district court erred in determining that section 48-1-32 served as a legislative declaration that the type of contract at issue in this case was "unlawful" and "absolutely void." Instead, we conclude that the first *Ockey* factor weighs in favor of a finding that the contract at issue is voidable, rather than void.

### B. We conclude that the TNE transaction did not harm the public as a whole

¶35 We also conclude that the second *Ockey* factor—whether the contract harmed the public as a whole—weighs against a finding that the contract is void. In so doing, we note that the district court did not consider the second *Ockey* factor as part of its analysis. But, on appeal, TNE argues that the type of transaction at issue in this case does not harm the public as a whole because, as a typical business transaction, it does not implicate public health, morality, or welfare. We agree with TNE.

¶36 Although, under the Act, Mr. Muir may not have had authority to enter into the TNE transaction, it was not the type of transaction that harms the public as a whole. Typically, contracts

---

[43] *Id.* Our case law explains that a partner acts within the scope of his or her apparent authority when the "conduct of the principal . . . , reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Luddington*, 855 P.2d at 209 (quoting RESTATEMENT (SECOND) OF AGENCY § 27 (AM. LAW INST. 1957)).

[44] *Luddington*, 855 P.2d at 208.

that "harm[] the public as a whole,"[45] are those that, by their terms, harm more than the parties involved in the transaction.[46] For example, we have determined that contracts that "control prices and limit competition between the bids given" to contractors "create an unreasonable restraint on trade" and, as a result, harm "the public as a whole."[47] We have also determined that contracts for an illegal purpose harm the public as whole. But the TNE transaction was not a contract for an illegal purpose nor does it harm parties outside the transaction. Accordingly, we conclude that the second *Ockey* factor—whether the contract harms the public as a whole—does not weigh in favor of a finding that the TNE transaction is void.

¶37 In sum, the district court erroneously held that the Act sets forth a well-defined and dominant public policy that renders the TNE transaction void. Even though Mr. Muir did not enter into the TNE transaction for the purpose of winding up partnership affairs, and therefore may have lacked authority to enter into that transaction, the Act as a whole does not clearly demonstrate that this type of transaction violates a well-defined and dominant public policy.[48] Additionally, the transaction did not harm the public as a whole. Accordingly, we conclude that the TNE transaction is presumptively voidable, not void—a presumption Wittingham has failed to rebut. For this reason, we reverse the district court's decision in this regard and remand for further proceedings consistent with this opinion.

*C. We remand for the district court to make further factual findings in order to determine whether Wittingham was bound under other provisions of the statute*

¶38 Rather than remand, TNE asks us to rule in its favor on a number of equitable claims and defenses, including its affirmative defense of estoppel and its affirmative claims for relief under promissory estoppel and section 164 of the Second Restatement of

---

[45] *Ockey*, 2008 UT 37, ¶ 23.

[46] *See id.* ¶ 24.

[47] *Id.* ¶ 23.

[48] *Id.* ¶ 22 ("Although the bank had acted in excess of its authority [when it issued securities different from those that it was statutorily authorized to issue], its action did not violate the general policy of the state so egregiously that the contract was void.").

Contracts. But because there are "legal remedies available" under the statute that may preclude equitable remedies, we remand the case to allow the district court to enter factual findings on whether the Muir Partnership was bound even though Mr. Muir did not intend to wind up partnership affairs.[49]

¶39 The "right to an equitable remedy is an exceptional one, and absent statutory mandate, equitable relief should be granted only when a court determines that damages are inadequate and that equitable relief will result in more perfect and complete justice."[50] So equitable relief is "precluded" if TNE has "an adequate remedy at law and will not suffer substantial irreparable injury."[51]

¶40 TNE may have additional legal remedies available under the Act. As previously discussed, the statute outlines a general partner's actual authority to enter into new transactions post-dissolution. And there are multiple factual scenarios in which a partnership could be bound by a general partner's post-dissolution actions. The statute mandates that the district court apply common-law agency principles such as apparent authority or partner-by-estoppel, both of which would allow the court to enforce the TNE trust deed against the Muir Partnership or Mr. Muir in his individual capacity, even if Mr. Muir did not enter into the transaction for the purpose of winding up Muir Partnership affairs.[52]

¶41 Because the TNE transaction is voidable, rather than void, TNE may have a number of legal remedies available under the statute. Accordingly, we remand this case for the district court to determine whether TNE has an available legal remedy. Only after it has made the appropriate factual findings and subsequent legal

---

[49] *VCS, Inc. v. Utah Cmty. Bank*, 2012 UT 89, ¶ 41, 293 P.3d 290 (citation omitted).

[50] *Ockey*, 2008 UT 37, ¶ 44 (citation omitted).

[51] *Id.*

[52] *See* UTAH CODE §§ 48-1-11, -13 (2009).

conclusions should the court consider TNE's claims for equitable relief.[53]

## II. The District Court Erred in Holding it Lacked Jurisdiction Over Mr. Muir

¶42 TNE also argues the district court erred in "rul[ing], *sua sponte*, that . . . it lacked jurisdiction" over Mr. Muir based on TNE's failure to serve its cross-claims against Mr. Muir pursuant to Utah Rule of Civil Procedure 4. According to TNE, even though it did not comply with the requirements of rule 4, the court nevertheless erred because TNE properly served Mr. Muir under rule 5 by sending a copy of the Amended Cross-claims to Mr. Muir's attorney, who accepted receipt. Alternatively, TNE argues that even if it was required to serve Mr. Muir under rule 4, the court erred because Mr. Muir waived an objection to improper service of process. We agree with TNE's alternative argument. Because Mr. Muir failed to object to improper service under rule 4 "before

---

[53] If the district court determines that TNE does not have a legal remedy available, it should determine whether TNE's request for an equitable remedy is preempted by the Act. Equitable remedies may be explicitly or implicitly preempted when the legislature "displaces our residual common-law authority" through "duly-enacted legislation." *VCS, Inc.*, 2012 UT 89, ¶ 22. If the Act "reveals either an express or implicit legislative intent to preempt common law" remedies, then TNE is not entitled to an equitable remedy. *Graham v. Albertson's LLC*, 2020 UT 15, ¶ 10, 462 P.3d 367. Express intent is typically provided in an "express exclusive remedy provision." *Id.* ¶ 7. If there is no express intent provided, courts must consider whether the Act's "structure and purpose" provide an implicit intent to preempt a common-law remedy. *Id.* ¶ 14 (citation omitted) (internal quotation marks omitted). An implicit intent to preempt a common-law remedy exists if "the [Act's] regulatory scheme is so pervasive that the common law doctrine can no longer function," or "the [Act] is in irreconcilable conflict with the common law." *Id.* ¶ 14 (citation omitted) (internal quotation marks omitted). If the court finds that either an explicit or implicit intent to preempt exists, it must then determine if the specific equitable remedies requested by TNE "fall[] within the scope of what the Legislature intended [the Act] to preempt." *Id.* ¶ 10. And if the court does so determine, then TNE's requested equitable relief is unavailable. *Id.*

or during trial," any objection to the improper service was waived.[54] As a result, the district court had jurisdiction over him. Accordingly, we reverse the court's jurisdictional determination.

¶43  Service of process "confers jurisdiction"[55] over a defendant because it "imparts notice that the defendant is being sued and must appear and defend or suffer a default judgment."[56] When a party initiates an action, it must serve a defendant under Utah Rule of Civil Procedure 4. The rule outlines many proper methods of service, all of which attempt to ensure that the other party has "adequate notice" of an action and an "opportunity to be heard in a meaningful manner" throughout the proceedings.[57]

¶44  When a co-defendant asserts a cross-claim in a "pleading after the original complaint," service is governed by Utah Rule of Civil Procedure 5.[58] After an initial complaint is filed and properly served under rule 4, most subsequent pleadings and motions can be served under the less stringent requirements of rule 5.[59] But if a party "assert[s] new or additional claims for relief" against a defaulting party, it must serve those new or additional claims pursuant to rule 4.[60] So when a party has defaulted for any reason, rule 4 service is required for all new claims against that defaulting party. Accordingly, TNE's service of Mr. Muir under the procedures outlined in rule 5 was insufficient.

¶45 When a party fails to properly serve a defendant, the defendant can assert the affirmative defense that the court lacks personal jurisdiction as a result of insufficient service of process. Our rules of civil procedure require that a defendant raise the

---

[54] UTAH R. CIV. P. 12(h).

[55] *Bel Courtyard Invs., Inc. v. Wolfe*, 2013 UT App 217, ¶ 13, 310 P.3d 747 (citation omitted) (internal quotation marks omitted).

[56] *Meyers v. Interwest Corp.*, 632 P.2d 879, 880 (Utah 1981).

[57] *Chen v. Stewart*, 2004 UT 82, ¶ 68, 100 P.3d 1177, *abrogated on other grounds by State v. Nielsen*, 2014 UT 10, 326 P.3d 645.

[58] UTAH R. CIV. P. 5(a)(1)(C).

[59] For example, most papers can be properly served under rule 5 by "emailing it to . . . the most recent email address" of the party's attorney. *Id.* 5(b)(3)(B).

[60] *Id.* 5(a)(2)(E).

affirmative defense of insufficient service of process in a motion or responsive pleading before or during trial.[61] To assert this affirmative defense, the defendant must file a motion to dismiss in a "responsive pleading" or "by motion."[62] If a defendant fails to do so, the affirmative defense is waived.[63] Additionally, the right to service of process can be waived either when a defendant expressly waives it or when a defendant implicitly waives it by participating in the proceedings without objecting to the court's jurisdiction.[64] These waiver rules are an important aspect of our procedural system.

¶46 "In our system, the rules provide the source of available relief. They '[are] designed to provide a pattern of regularity of procedure which the parties and the courts [can] follow and rely upon.'"[65] The waiver rule furthers this pattern of regularity because it allows the parties to limit their focus (and expenditure of resources) to only those issues that they deem most important. So when courts take it upon themselves to address issues not raised by the parties, the court forces the parties to expend time and resources addressing an issue that may not be particularly important to them.[66]

¶47 For example, a party could intentionally decline to object to improper service under rule 4 because, having been put on

---

[61] And rule 60(b) provides a post-judgment remedy for defendants who did not, as a result of insufficient service of process, waive the defense before or during trial because they were unaware of the proceedings against them.

[62] *Id.* 12(b).

[63] *Id.* 12(h).

[64] *See Bel Courtyard Invs., Inc.*, 2013 UT App 217, ¶ 13 ("[W]here a party has not been adequately served with process, a defect in service can be waived if the party makes a general appearance.").

[65] *A.S. v. R.S.*, 2017 UT 77, ¶ 23, 416 P.3d 465 (alterations in original) (citation omitted) (internal quotation marks omitted).

[66] We note that "challenges to subject matter jurisdiction may be raised at any time and cannot be waived by the parties." *Barnard v. Wassermann*, 855 P.2d 243, 248 (Utah 1993). But we have previously "conclude[d] that the prohibition against waiver applies only to subject matter jurisdiction," not to personal jurisdiction. *Id.*

notice in some other way, the party may decide that it is not worth the time and expense to contest the improper service. In such a case, the court's decision to raise the improper service issue would deprive the improperly served party of control over its preferred allocation of time and money. For this reason, it is generally the case that only after a defendant asserts a defense that a court should consider the merits of the defense. This rule is both fair and efficient.

¶48 The rule allowing a defendant to implicitly waive the right to sufficient process through an appearance is fair because by participating in the proceedings, the party is on notice and so rule 4's purpose has been fulfilled.[67] And the rule is efficient because it allows the defendant to offer relevant evidence that service was insufficient—and allows the plaintiff (or cross-claimant) to offer relevant rebuttal evidence—before the court issues a decision on the merits of the defense. In this way, our waiver rule provides a pattern of regularity of procedure that the parties and the courts can follow and rely on.

¶49 But when a court disregards the waiver rule by raising a defendant's affirmative defense on its own initiative, the benefits of our predictable procedural system are lost. In this case, the district court ruled that it lacked personal jurisdiction over Mr. Muir based on insufficient service, even though Mr. Muir did not raise this defense. In so doing, the court disrupted the "pattern of regularity" that is the aim of our procedural rules.

¶50 Because Mr. Muir never raised the insufficient service defense, Mr. Muir and TNE did not have the opportunity to argue its merits. Instead, TNE was forced to offer new evidence on appeal to refute the court's ruling. And, on appeal, TNE argues that service

---

[67] With the exception of the affirmative defense that a court lacks subject matter jurisdiction, the rules provide that it is a defendant, not the court or a third-party, who must raise an affirmative defense. UTAH R. CIV. P. 12(h). If a defendant later learns of an action against him or her after judgment has been entered, he or she may seek relief by asserting the affirmative defense in a rule 60(b) motion with the district court. UTAH R. CIV. P. 60(b); *see also State v. All Real Prop., Residence & Appurtenances*, 2005 UT 90, ¶ 14, 127 P.3d 693 (requiring parties to "raise an insufficient service defense" in their "first rule 60(b) motion" to avoid waiving the defense).

was proper under rule 5 because the cross-complaint was served on Mr. Muir's attorney, Mr. Canterero. TNE also offers evidence that Mr. Muir waived the affirmative defense because he appeared in the proceeding. On the other hand, Wittingham (not Mr. Muir) attempts to defend the court's determination with its own evidence.

¶51 So, as a result of the district court's decision to *sua sponte* decide the service of process issue, the parties have been forced to raise arguments on appeal that could have, and should have, been raised before the district court. And Wittingham has been forced to argue in support of an affirmative defense that belongs to Mr. Muir, not to Wittingham. This is the kind of situation our waiver rule is designed to avoid.

¶52 Because the defense of insufficient service may be waived by the party who allegedly did not receive sufficient service, and because Mr. Muir did not raise it, he waived the right to proper service and so was a party to the action. Accordingly, the court erred in dismissing TNE's cross-claims against Mr. Muir and fraudulent transfer claims against both Mr. Muir and Wittingham.[68] As a result, we reverse and remand for the court to consider these claims on the merits.

## III. We Deny the Relief Requested in Wittingham's Cross-Appeal

¶53 Wittingham raises three issues on cross-appeal. First, it argues that the district court erred in declaring Mr. Muir competent to enter into the TNE transaction because the court "failed to give proper weight to the factual circumstances of the case" and because TNE's expert witness used improper circular reasoning. To prevail on this claim, Wittingham must show that the court's findings are "against the clear weight of the evidence."[69] Because the expert testimony upon which the court relied, and which Wittingham criticizes on appeal, is not entirely based on the allegedly improper reasoning, and because the court's finding is supported by undisputed lay witness testimony, we hold that the district court

---

[68] In fact, Mr. Muir submitted an affidavit stating he did not want to assert his right to defend himself against Wittingham's claims. He submitted to the court that he "chose not to dispute [Wittingham's] allegations" against him because it "was entitled to default judgment against" him.

[69] *State v. Walker*, 743 P.2d 191, 193 (Utah 1987).

did not clearly err in finding that Mr. Muir was competent when he entered into the TNE transaction.

¶54 Second, Wittingham argues the district court erred in declaring that Mr. Muir entered into the TNE transaction on behalf of the Muir Partnership, not on behalf of the second partnership he created with a nearly identical name. Because we agree that the identity of the borrower is ambiguous in the contract and trust deed, the district court properly considered extrinsic evidence to discern the intent of the parties. We hold that the district court did not clearly err in interpreting this extrinsic evidence to conclude that Mr. Muir intended to bind the Muir Partnership, not the second partnership, when he entered into the TNE transaction.

¶55 Finally, Wittingham argues the district court erred in failing to award attorney fees under the Reciprocal Fee Statute. We decline to address the merits of this request.

*A. The district court did not err in concluding that Wittingham failed to meet its burden to show, by clear and convincing evidence, that Mr. Muir was incompetent when he entered into the TNE transaction on behalf of the Muir Partnership*

¶56 First, we consider Wittingham's challenge to the district court's competency determination. In that court, Wittingham asserted the TNE transaction was void because Mr. Muir was incompetent as a result of a head injury suffered years before. In support of this argument, Wittingham offered expert and lay witness testimony providing evidence of the impact the head injury continued to have on Mr. Muir. One lay witness testified he "was not the same person after" the head injury. And others testified that he has struggled to manage daily tasks since the injury. The court observed that throughout Mr. Muir's testimony, he had difficultly "remembering certain matters" and struggled to "communicate and manage his daily affairs." In rebuttal, TNE offered its own expert witness testimony and lay witnesses, and argued that despite the injury, Mr. Muir was competent to enter into the transaction. The district court agreed with TNE.

¶57 On appeal, Wittingham argues the district court erred in determining that Mr. Muir was competent. Wittingham argues this in two ways. First, it argues the court's finding was unsupported by the record and should be excluded because TNE's expert, who testified that Mr. Muir was competent, arrived at his conclusion through improper circular reasoning. Wittingham further argues that the court's determination "failed to give proper weight to the

factual circumstances in the case." But Wittingham fails to meet its burden of persuasion on appeal.

¶58 In addressing the court's determination, we begin with the principle that parties are generally presumed to be competent to enter into a contract.[70] This presumption can be rebutted only if the party asserting incompetence can show, by clear and convincing evidence, that an individual's "mental facilities [were] so deficient or impaired that there was not sufficient power to comprehend the subject of the contract, its nature and its probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life."[71] The "capacity" to contract "is measured at the time of the execution of the contract."[72] So to prevail on an incompetency claim, a party typically must submit testimony from witnesses who observed the individual at or near the time of the transaction.[73]

¶59 And because we review the court's factual findings regarding Mr. Muir's competency under a clearly erroneous standard of review,[74] to prevail, Wittingham must show that the court's finding that Wittingham failed to rebut the competency presumption is "against the clear weight of evidence."[75] In conducting this review, we give "due regard" to the district court's "opportunity to judge the credibility of the witnesses."[76] After

---

[70] *Anderson v. Brinkerhoff*, 756 P.2d 95, 99–100 (Utah Ct. App. 1988).

[71] *Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 17, 48 P.3d 941 (alteration in original) (citation omitted) (internal quotation marks omitted).

[72] *Anderson*, 756 P.2d at 100.

[73] *Peterson*, 2002 UT 42, ¶ 18 (stating that none of the individuals who were present at the time the allegedly incompetent party entered into the contract "raised any concerns" about mental capacity, so no evidence was offered to rebut the presumption of competency).

[74] *Montes Family v. Carter* (*In re Estate of Ioupe*), 878 P.2d 1168, 1174 (Utah Ct. App. 1994).

[75] *Walker*, 743 P.2d at 193.

[76] UTAH R. CIV. P. 52(a)(4).

considering all relevant record evidence, we uphold the court's competency determination.

¶60 First, Wittingham challenges the testimony of TNE's expert witness, Dr. Schenkenberg, to support its assertion that the district court erred in determining that Wittingham failed to prove that Mr. Muir was incompetent. Specifically, it argues that Dr. Schenkenberg used improper circular reasoning—the *post hoc ergo propter hoc* fallacy—to conclude Mr. Muir was competent. According to Wittingham, Dr. Schenkenberg determined that Mr. Muir was competent because Mr. Muir had never been declared incompetent. And as a result, Wittingham argues that its expert witness's testimony was "essentially" unrebutted.

¶61 We agree, of course, that a conclusion relying "exclusively" on an improper logical fallacy is insufficient.[77] For example, in *USA Power, LLC v. PacifiCorp*,[78] which is a case Wittingham cites in support of its argument, we held that a party's "[e]vidence that relie[d] exclusively on the *post hoc ergo propter hoc* fallacy—'after this and therefore because of this'" was insufficient."[79] We explained that we do not "assum[e] a causal connection between two events merely because one follows the other,"[80] and that a failure to provide evidence to connect such an inference of causation is "'wholly speculative,' and cannot support a verdict."[81] But our reasoning in *USA Power* is not enough to lead to the conclusion that the district court's "competency" finding in this case was clearly erroneous, because we are not convinced that Dr. Schenkenberg relied "exclusively" on circular reasoning.

¶62 At trial, Dr. Schenkenberg was asked to opine on whether Mr. Muir was competent when he entered into the TNE transaction. He described the evidence he obtained in order to reach his conclusion: first, he examined Mr. Muir and administered multiple tests, including tests that measured executive functioning skills and verbal comprehension; second, he reviewed documents that included Mr. Muir's medical records and observations of his

---

[77] *USA Power, LLC v. PacifiCorp.*, 2016 UT 20, ¶ 136, 372 P.3d 629.

[78] *Id.*

[79] *Id.*

[80] *Id.* (alteration in original) (citation omitted).

[81] *Id.* ¶ 137 (citation omitted).

behavior following the head injury; third, he reviewed medical literature; and fourth, he noted that there had never been a formal determination that Mr. Muir was incompetent. When asked for his ultimate conclusion after reviewing all the evidence, Dr. Schenkenberg stated that he began with the assumption that Mr. Muir was competent because at the time Mr. Muir entered into the transaction, "there had been no . . . demonstration that there was not competence, so no formal adjudication of that had been done."

¶63 Wittingham argues this testimony is insufficient because it relies "exclusively" on an improper logical fallacy: Dr. Schenkenberg "concluded that Mr. Muir was competent" because Mr. Muir "had not yet been adjudicated incompetent." But in his testimony Dr. Schenkenberg relied on other evidence to support his ultimate conclusion. He reviewed Mr. Muir's medical records, examined Mr. Muir and administered various tests, reviewed deposition testimony, and reviewed scientific literature. In his testimony at trial, he noted that Mr. Muir performed "average" to "very well" on the tests he administered during the physical examination. He also noted the record he reviewed indicated that Mr. Muir signed "a wide range of documents" after his initial injury but before the TNE transaction, including informed consent forms for follow-up treatment and contracts for "selling a house" and "getting a divorce." Dr. Schenkenberg opined that the absence of any third party's concern or a formal declaration that Mr. Muir was incompetent for these other transactions was important evidence suggesting that Mr. Muir was competent to enter into the TNE transaction. So while Dr. Schenkenberg articulated the legal presumption that Mr. Muir was competent, he relied on other evidence to support that conclusion. He did not rely exclusively on the absence of any formal adjudication that Mr. Muir was incompetent. So we do not agree that Dr. Schenkenberg's testimony is insufficient to support the district court's competency determination.

¶64 But, even were we to exclude Dr. Schenkenberg's testimony, we would nevertheless uphold the district court's competency determination. Wittingham argues that, once TNE's expert testimony is excluded, the evidence of its own expert is "essentially unrebutted." And according to Wittingham, this unrebutted expert testimony, coupled with the factual circumstances of the case, clearly weighs against the district court's determination. We disagree.

¶65 In making its argument on appeal, Wittingham fails to address the other evidence the district court relied on. Expert testimony is not required in a competency proceeding. In fact, lay witness testimony may be more beneficial because it is more likely to provide direct evidence of an individual's mental state during the relevant time period—when the individual entered into the contract. In other words, a district court can rely solely on lay witness testimony when determining competency. And in this case, the district court heard lay witness testimony from four individuals who testified that Mr. Muir "understood the proposed transaction." Wittingham makes no attempt to challenge, or address, that testimony on appeal.

¶66 Instead, Wittingham argues the district court failed to properly consider the factual circumstances of the case when it determined that Wittingham failed to prove, by clear and convincing evidence, that Mr. Muir was incompetent when he entered into the TNE transaction. In support of this argument, Wittingham points to Mr. Muir's head injury, which occurred years before the TNE transaction. And it argues that the expert and lay witness testimony showed that the head injury significantly impacted Mr. Muir's daily affairs. Wittingham also asserts, based in part on the fact that the court had already determined the Trump defendants engaged in a fraudulent scheme, that Mr. Muir was coerced into the transaction.

¶67 But we are not persuaded that the district court failed to properly consider these "factual circumstances." Although the district court did not rule in Wittingham's favor on this issue, Wittingham presents no evidence (other than the district court's adverse ruling) to suggest that the court failed to consider the evidence Wittingham points to on appeal. And, as we discussed, the record contains testimony from lay witnesses that Mr. Muir understood the TNE transaction.

¶68 It is true that this lay witness testimony conflicts with the witness testimony presented by Wittingham. But the district court is in "the best position to assess the credibility of the witnesses and to gain a sense of the proceeding as a whole."[82] And in arriving at

---

[82] *Valcarce v. Fitzgerald*, 961 P.2d 305, 314 (Utah 1998); *see also Wasatch County v. Okelberry*, 2008 UT 10, ¶ 8, 179 P.3d 768 (explaining that we give great deference to the district court's

(Continued)

its decision, we assume the court weighed the conflicting testimony presented by both parties.[83] So Wittingham's argument that the court did not consider the factual circumstances of the case fails.

¶69 In sum, Wittingham fails to show that the district court could not rely on TNE's expert witness testimony. And, even if TNE's expert witness testimony should have been excluded, Wittingham does not show that the record evidence as a whole clearly weighs against the court's determination. This is because the record contains testimony of four lay witnesses who testified that Mr. Muir was competent at the time he entered into the transaction. Accordingly, we affirm the district court's competency determination.

*B. The district court did not err in determining Mr. Muir executed the TNE trust deed on behalf of the Muir Partnership*

¶70 Wittingham also argues the district court erred in determining that the TNE trust deed was executed on behalf of the Muir Partnership and not the second partnership. According to Wittingham, the district court erred in relying on the concept of "misnomer," instead of the concept of "misidentification," in interpreting the language of the TNE trust deed. We disagree.

¶71 When interpreting a contract or deed, a court attempts "to give effect to the intent of the parties" by first looking to the "plain language" within the "four corners of the deed" or contract.[84] And we interpret a contract or deed "in light of the reasonable expectations of the parties, looking to the agreement as a whole and to the circumstances, nature, and purpose of the contract."[85] When a term is ambiguous—"capable of more than one reasonable

---

factual findings, particularly those that "involve[] various and complex facts . . . and credibility determinations").

[83] "Where contradictory testimony is offered by two witnesses, '[t]he fact finder is free to weigh the conflicting evidence presented and to draw its own conclusions.'" *Valcarce*, 961 P.2d at 314 (alteration in original) (citation omitted).

[84] *Ault v. Holden*, 2002 UT 33, ¶ 38, 44 P.3d 781 (citation omitted); *Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395.

[85] *Peirce v. Peirce*, 2000 UT 7, ¶ 19, 994 P.2d 193.

interpretation"[86]—we may consider "extrinsic evidence of the parties' intent."[87]

¶72  The interpretive issue at the heart of this case stems from the name listed as the grantor in the TNE trust deed. In order to create a proper conveyance of land, a deed must identify "the grantor, the grantee, and . . . a description of the boundaries in a manner sufficient to construe the instrument as a conveyance of an interest in land."[88] When the name of a grantee or grantor is missing or incapable of identification, a court may invalidate a deed. But when the deed merely contains a misnomer because it adds or omits "minimal" or "legally insignificant" words to the name of the entity listed as a party, a court need not invalidate a deed so long as the grantee or grantor "can be ascertained by sufficient evidence."[89] In other words, a court will not invalidate a deed for a technical error in a name when the party to the transaction is clear.

¶73  In this case, the trust deed listed "Muir Second Family Limited Partnership" as the grantor (and owner of apartment buildings serving as security for the loan). This is problematic because Mr. Muir managed two partnerships with nearly identical names. He managed the dissolved Muir Partnership, which is named "*The* Muir Second Family Limited Partnership" and the second partnership, which is named "Muir Second Family Limited Partnership." So the only difference between the names of the two

---

[86] *Brady*, 2019 UT 16, ¶ 54 (emphasis omitted).

[87] *Id.* ¶ 53.

[88] *Rocky Mountain Energy v. Utah State Tax Comm'n*, 852 P.2d 284, 286 (Utah 1993).

[89] *Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 22–23, 87 P.3d 734 (citation omitted). In *Kelly*, the plaintiff asked the court to invalidate a deed that transferred interest in land from a limited liability company to a lender. *Id.* ¶¶ 2, 21. The plaintiff argued that because the listed borrower was "PCO Holdings, Inc.," which is not a legal entity, instead of "PCO Holding Company, Inc.," the deed was invalid due to the insufficient description of the borrower. *Id.* ¶¶ 21–22. The court of appeals determined that this was a misnomer because the "descriptive difference between" the named grantee "and the actual corporate identity of the intended grantee" was "minimal" and "legally insignificant." *Id.* ¶ 23.

partnerships is that the name of the second partnership is missing the definite article "the." And, importantly, under the Utah Revised Uniform Limited Partnership Act, "the presence or absence of the word[] . . . 'the'" is "not distinguishing."[90] So by listing "Muir Second Family Limited Partnership" as the grantor, the trust deed could be referring to the dissolved Muir Partnership, which was the owner of the apartments being encumbered by the trust deed, or it could be referring to the second partnership, which had no legal interest in the apartments.

¶74 In light of the existence of two entities with legally indistinguishable names, the district court determined that the trust deed was capable of more than one reasonable interpretation regarding the identity of the grantor and was therefore ambiguous. And, because the identity of the grantor was ambiguous, the court considered extrinsic evidence to determine, based on the intent of the parties, which entity was the grantor in the TNE transaction.[91]

¶75 After considering extrinsic evidence, the district court concluded that the omission of the "the" from the trust deed was merely a misnomer. A misnomer occurs when the right party is involved but is misnamed, allowing a court to overlook the error in the absence of prejudice.[92] And the court concluded that the parties intended to identify the dissolved Muir Partnership, the entity with a legal right in the apartments, but inadvertently failed to include the "the" in the deed.

¶76 In contrast, Wittingham argues that the court should have relied on the concept of "misidentification," which occurs when a party mistakenly sues the wrong entity because the mistaken entity

---

[90] UTAH CODE § 48-2a-102(6)(c) (2009).

[91] We also note that extrinsic evidence is permissible, even if a contract is unambiguous, if a party can show that the contract was the result of a mutual mistake or fraud. *See Jensen v. Manila Corp. of the Church of Jesus Christ of Latter-day Saints*, 565 P.2d 63, 64–65 (Utah 1977). While TNE requested relief under both principles, the court resolved the issue on ambiguity.

[92] *See Reddyship P'ship/5900 N. Freeway LP v. Harris Cty. Appraisal Dist.*, 370 S.W.3d 373, 376 (Tex. 2012); *see also Misnomer*, MERRIAM–WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary (last visited July 8, 2020) ("[T]he misnaming of a person in a legal instrument.").

has a similar name to the correct entity. According to Wittingham, the omission of "the" in this case is more properly characterized as a "misidentification," not a misnomer, because, unlike in other "misnomer" cases, an entity with the exact name listed in the trust deed—the second partnership—exists. And because the trust deed lists an entity that has no legal interest in the subject matter of the transaction—the apartments—Wittingham argues that the trust deed is void.[93] In other words, Wittingham suggests that the deed unambiguously identifies a grantor but that the deed is nevertheless void because the identified grantor has no property interest in the property secured by the deed. We disagree.

¶77 We reject Wittingham's argument and conclude that the omission of the word "the" from the trust deed does not clearly, and incorrectly, identify another entity as the intended grantor. This is because the inclusion of the word "the" does not create a legally significant distinction between entities.[94] So even though the trust deed did not include the word "the," it could have referred, as a matter of law, to either the dissolved Muir Partnership or the second partnership.

¶78 Accordingly, we find no error in the court's ruling. Because the word "the" does not create a legally recognizable distinction between the dissolved Muir Partnership and the second partnership, the trust deed was ambiguous and the court did not err in considering extrinsic evidence in reaching its conclusion that

---

[93] Wittingham cites case law from other jurisdictions to argue that the proper remedy in "misidentification" cases is to void the transaction. For example, in *Clinton v. Avello*, the plaintiff named Bernard V. Avello as a defendant instead of Bernard J. Avello. 434 N.E.2d 355, 356–57 (Ill. Ct. App. 1982). Because both persons existed, the court affirmed summary judgment against the plaintiff because of the misidentification. *Id.* Because we conclude that the concept of "misidentification" does not apply in this case, we do not decide what the proper remedy would be in a "misidentification" case.

[94] *See* UTAH CODE § 48-2a-102(6)(c) (2009) (providing that when establishing an entity name with the division, the addition or omission of the word "the" is not distinguishing).

the parties intended to list the Muir Partnership, as the legal owner of the apartments, on the trust deed.[95]

*C. We vacate the district court's decision to not award attorney fees and remand for a new determination following final judgment upon remand*

¶79 Wittingham argues that the district court erred in declining to award it attorney fees. But, because "our rulings on the other issues in this case may have upended the basis for the court's attorney fees decision, we decline to address" Wittingham's arguments.[96] "Instead, we vacate the district court's previous decision and remand for a new . . . determination" if the parties' seek attorney fees following the district court's final judgment upon remand.[97]

**Conclusion**

¶80 After employing the analysis required under *Ockey v. Lehmer*,[98] we reverse the district court's determination that the TNE trust deed was void. We do so because the statutes at issue in this case fail to provide a clear and well-defined public policy indicating that the type of transaction at issue here should be void and because the TNE transaction deed did not harm the public as a whole. As a result, the TNE trust deed is voidable. And we remand for further proceedings consistent with this opinion.

---

[95] We note that the type of ambiguity at issue in this case is described as a "latent" ambiguity. A latent ambiguity "arises from a collateral matter when the document's terms are applied or executed," *Watkins v. Ford*, 2013 UT 31, ¶ 28, 304 P.3d 841 (citation omitted), and include matters such as "trade usage, *the mislabeling of a person or thing*, or linguistic context." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 42, 367 P.3d 994 (emphasis added). In this case, the district court relied on extrinsic evidence — that Mr. Muir managed two partnership with nearly identical names — when it determined a latent ambiguity existed as to the identity of the grantor. And based on this objective extrinsic evidence, the district court correctly determined that the trust deed was ambiguous as to the identity of the grantor.

[96] *Brady*, 2019 UT 16, ¶ 112.

[97] *Id.*

[98] 2008 UT 37, 189 P.3d 51.

¶81 We also reverse the district court's determination that it lacked jurisdiction over Mr. Muir. Because Mr. Muir waived any objection to insufficient service, he was a proper party to the action over whom the court had jurisdiction. Accordingly, we remand for further proceedings on TNE's cross-claims and fraudulent transfer claims.

¶82 We also decline to grant any of the claims Wittingham raises on cross-appeal. First, we hold that the district court did not clearly err when it found that Mr. Muir was competent at the time he entered into the TNE transaction because that determination was supported by sufficient evidence. Second, we hold that the court did not clearly err in determining that the parties to the TNE transaction intended to bind the Muir Partnership, not the second partnership. And finally, we decline to address the merits of Wittingham's request for attorney fees under the Reciprocal Fee Statute. Instead, we vacate the court's judgment so that the district court can make a new attorney fee determination, upon the party's request, on remand.

---