*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 14**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

WESTON BENNION,
*Petitioner,*

*v.*

DALE STOLROW,
*Respondent.*

No. 20220901
Heard October 18, 2023
Filed May 16, 2024

On Certiorari to the Utah Court of Appeals

Second District, Weber County
The Honorable Joseph M. Bean
No. 180902051

Attorneys[*]:

Emily Adams, Freyja Johnson, Hannah Leavitt-Howell, Bountiful, Lindy W. Hamilton, Robert W. Gibbons, Ogden, for petitioner

Troy L. Booher, Beth E. Kennedy, Taylor P. Webb, Trystan B. Smith, Todd A. Turnblom, Tajha L. Ferrara, Salt Lake City, for respondent

JUSTICE POHLMAN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, and JUSTICE HAGEN joined.

JUSTICE POHLMAN, opinion of the Court:

---

[*] Additional attorneys: Alyson C. McAllister, Salt Lake City, for *amicus curiae* Utah Association for Justice; Zachary E. Peterson, Salt Lake City, for *amicus curiae* Utah Defense Lawyers Association.

## INTRODUCTION

¶1    Weston Bennion was injured when his apartment deck collapsed. He sued his landlord, Dale Stolrow, for negligence, and the parties eventually settled. Bennion agreed to release Stolrow and his insurer, State Farm,[1] from all claims in exchange for $150,000. Bennion further agreed that the settlement was subject to related subrogation claims and healthcare liens, and he promised to indemnify Stolrow from liability for any such claims and liens.

¶2    Before tendering the $150,000 payment, Stolrow informed Bennion that he intended to distribute the payment in two checks: one payable to Bennion and the other payable to a collection agency that, according to Stolrow, had a healthcare lien on the settlement funds. Bennion objected and filed a motion to enforce the parties' agreement, arguing that its terms did not allow Stolrow to issue a portion of the settlement funds to a third party. The district court disagreed and suggested that Stolrow issue two checks: one jointly to Bennion and the third party for the amount of the lien, and another to Bennion for the remainder of the funds. The court of appeals affirmed the district court's decision, and Bennion petitioned for certiorari.

¶3    We granted certiorari to address whether the court of appeals erred in concluding that the parties' agreement permitted Stolrow to issue a portion of the settlement funds jointly to Bennion and the third-party collection agency. Bennion asserts the agreement requires payment exclusively to him. We agree. The plain language of the release provides for payment to Bennion in exchange for his release of claims against Stolrow and his assumption of responsibility for third-party liens. Accordingly, we reverse.

## BACKGROUND

¶4    Bennion was injured when the floorboards of his apartment deck collapsed, dropping him twenty-five feet to the ground. Bennion claimed his landlord, Stolrow, was negligent and was responsible for the medical expenses and other damages Bennion incurred. After more than two years of litigation, the

---

[1]    Although not a party to this appeal, State Farm represented Stolrow's interests during the litigation. For simplicity, throughout this opinion, we refer to Stolrow and State Farm collectively as Stolrow, except where the distinction is relevant.

parties mediated their dispute and reached a settlement. Bennion agreed to accept $150,000 to release his claims against Stolrow and his insurer, State Farm.

¶5 After the mediation, Stolrow's counsel sent a letter to Bennion's counsel expressing appreciation for the settlement and including a written release prepared for Bennion's signature. Paragraph 2 of the release provides that in consideration of $150,000, Bennion releases Stolrow from all claims and demands related to the deck incident. The release further states that "the payment made in consideration of [Bennion's] release is intended to and does release and discharge any claims by him in regard to [any] unknown or future complications." And it declares it is "a fully binding and complete settlement" between Bennion and Stolrow.[2]

¶6 The release also contains subrogation and hold harmless provisions. Paragraph 7 of the release, titled "Subrogation Claims or Liens," states:

> Weston Bennion, and his counsel of record acknowledge that this settlement is, or may be, subject to one or more subrogation claims or health care liens. Weston Bennion expressly agrees to indemnify and save harmless Dale Stolrow . . . and State Farm . . . from any and all liability for such health care liens and from any other lien or subrogation claim arising out of the incident which is the subject of this release. All medical and other expenses and losses incurred by Weston Bennion, past, present, and future as a result of the incident referred to above, shall be Weston Bennion's own responsibility. The consideration paid to Weston Bennion for this release is intended to cover all such expenses or losses.

¶7 Paragraph 8 of the release, titled "Hold Harmless," states that if any person or entity brings a claim or other legal action "of any kind" against Stolrow arising from the deck incident, Bennion

---

[2] The clause in its entirety reads: "This release shall be a fully binding and complete settlement among Weston Bennion, Dale Stolrow and Manya Stolrow, and their companies, trusts, and business entities; State Farm; and their respective heirs, agents, employees, administrators, executors, successors, and assigns."

agrees "to indemnify, defend and hold harmless" Stolrow "from any and all liability, loss or expense of any kind, nature, or description."

¶8 In the letter accompanying the prepared release, Stolrow's counsel advised that he had notice of a lien for $9,103 from a third-party collection agency, Rawlings Company for BlueCross/Blue Shield (Rawlings).[3] Counsel also stated that Stolrow planned to "issue a separate check for the lien and the remainder to [Bennion and Bennion's counsel]." Bennion signed the release and, a few weeks later, moved the district court to enforce the parties' agreement.

¶9 In his motion to enforce the settlement, Bennion argued that Stolrow had "unexpectedly attempted to add an additional term" to their agreement by insisting on making "a partial payment to [Bennion], with the remainder of the settlement funds being issued to . . . a third-party collections agency." He asserted that the terms of the release require that the $150,000 settlement payment be made only to him. He further argued that Stolrow has no legal obligation to any third parties, pointing to the subrogation and hold harmless provisions of the release, in which Bennion assumed responsibility for any and all subrogation claims and healthcare liens. In response, Stolrow argued that he had a duty to honor Rawlings' healthcare lien and that he could be liable to Rawlings if he ignored it.

¶10 The district court agreed with Stolrow. Without directly addressing Bennion's argument about the terms of the parties' agreement, the court concluded based on common law that Rawlings would have a claim against Stolrow if Rawlings' lien was not honored. Thus, the court instructed that Stolrow "should issue one check to [Bennion] in the undisputed amount, and one check to both [Bennion] and Rawlings in the disputed subrogation amount." The court concluded by suggesting that Bennion negotiate with Rawlings to the extent Bennion contested the validity of the lien.

¶11 Bennion moved the district court to reconsider. He argued that the court's decision was improperly designed to "avoid[] a risk that was already considered and addressed by the parties under the

---

[3] Bennion questions the validity of Rawlings' lien. The validity of the lien was not resolved below, but for purposes of our analysis we assume its validity in the amount Stolrow asserts.

plain terms of the Agreement," specifically the subrogation and hold harmless provisions.

¶12  Although the court acknowledged that its "decision was intended to balance the interests [Bennion] may have with his bargaining position with the lien claimant and the interests of [Stolrow] and his insurer in protecting against subrogation claims and liens," the court rejected Bennion's argument that its decision conflicted with the terms of the release. The court reasoned that its decision "complied with" the release terms because, although Bennion "is totally, absolutely responsible for indemnifying" Stolrow, Stolrow may still be left "in a position where . . . [he] get[s] sued by Rawlings because Rawlings can't collect from [Bennion]." In support, the court referenced the "subject to" language in paragraph 7, stating that Bennion agreed that the settlement "would be subject to one or more subrogation claims or health care liens."

¶13 Bennion appealed. He asserted that the district court improperly focused on policy and substituted its preference for the plain language of the release. But the court of appeals affirmed the district court. *Bennion v. Stolrow*, 2022 UT App 93, ¶ 1, 516 P.3d 763. It held that a joint payment to Bennion and Rawlings "was appropriate" because "the plain language of the settlement agreement states that the settlement is 'subject to' claims like that of Rawlings" and "nothing" in the plain language "would prohibit" or "disallow[]" distributing a portion of the settlement funds to Rawlings as joint payee. *Id.* ¶¶ 15–16, 18.

¶14 Bennion petitioned this court for review. We granted certiorari on the question of whether the court of appeals erred in affirming the district court's conclusion that the release permitted Stolrow to issue a joint check to Bennion and a third-party payee for a portion of the settlement funds.

## ISSUE AND STANDARD OF REVIEW

¶15 Bennion contends that the court of appeals erred in interpreting the parties' agreement as one that permits payment to Bennion and a third party as joint payees where the third party asserts an interest in the settlement funds. "On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *ICS Corr., Inc. v. Utah Procurement Pol'y Bd.*, 2022 UT 24, ¶ 14, 513 P.3d 677 (cleaned up).

## ANALYSIS

¶16  Bennion contends that the court of appeals' interpretation of the release is contrary to its plain language. He interprets the release as unambiguously providing "for $150,000 in consideration to be 'paid to Weston Bennion.'" He asserts that the release does not permit Stolrow to materially change Bennion's legal interest in the settlement funds by issuing a portion of those funds jointly to "some unidentified potential third-party claimant selected by" Stolrow.[4]

¶17  Because releases are contractual provisions, we interpret them "according to well-developed rules of contract interpretation." *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 267 (Utah 1995). One of those well-developed rules directs that, when we interpret a contract, "we first look at [its] plain language . . . to determine the parties' meaning and intent." *Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395 (cleaned up). We interpret that plain language "in light of the reasonable expectations of the parties," *Wittingham, LLC v. TNE Ltd. P'ship*, 2020 UT 49, ¶ 71, 469 P.3d 1035 (cleaned up), and "we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless," *Peterson & Simpson v. IHC Health Servs., Inc.*, 2009 UT 54, ¶ 13, 217 P.3d 716 (cleaned up). If we conclude that the language is unambiguous, "we interpret the contract as a matter of law." *Id.* But we will deem a contractual provision ambiguous "if it is capable of more than one *reasonable* interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Brady*, 2019 UT 16, ¶ 54 (cleaned up).

¶18  Here, we conclude that the plain language of the release is unambiguous and does not permit Stolrow to satisfy the parties' agreement by issuing a portion of the $150,000 settlement in a check jointly payable to Bennion and Rawlings.

¶19  The release prepared by Stolrow and signed by Bennion contains no mention of Rawlings or a shared payment. Instead, paragraph 2 states that in consideration of $150,000, Bennion

---

4  Because Stolrow issued the check jointly to "Weston Bennion . . . & Rawlings," Bennion could not negotiate, discharge, or enforce the check on his own. *See* UTAH CODE § 70A-3-110(4) ("If an instrument is payable to two or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced only by all of them.").

releases Stolrow from all claims relating to the deck incident. Further, the release refers to a single payment, says nothing of Rawlings providing consideration in exchange for a portion of the settlement funds, and declares the settlement to be between Bennion and Stolrow.[5]

¶20 The court of appeals acknowledged that these parts of the release do not permit Stolrow to satisfy his settlement obligation by issuing a portion of Bennion's $150,000 settlement payment to a third-party claimant or lienholder. *Bennion v. Stolrow*, 2022 UT App 93, ¶ 13, 516 P.3d 763. Still, the court of appeals rejected Bennion's proffered interpretation of the release as unreasonable, concluding that paragraph 7 of the release "specifically permit[s]" payment to a lienholder. *See id.* ("[W]hile we agree with Bennion that [paragraph 2 of the release] does not specifically permit payment to a claimant or lienholder, we cannot say the same for paragraph 7 of the [release] . . . ."). Paragraph 7 states:

> [T]his settlement is, or may be, subject to one or more subrogation claims or health care liens. Weston Bennion expressly agrees to indemnify and save harmless Dale Stolrow . . . from any and all liability for such health care liens and from any other lien or subrogation claim arising out of the incident which is the subject of this release. All medical and other expenses and losses incurred by Weston Bennion, past, present, and future as a result of the incident referred to above, shall be Weston Bennion's own responsibility. The consideration paid to Weston Bennion for this release is intended to cover all such expenses or losses.

¶21 In interpreting this provision, the court of appeals focused on the first sentence, which provides that the settlement "is, or may be, subject to one or more . . . health care liens." *See id.* ¶ 14. The court interpreted "subject to" to mean "affected by" and observed that the provision "recognizes that the settlement made with Bennion may be impacted by existing . . . health care liens." *Id.* (cleaned up). Drawing on that recognition, the court concluded that it "was appropriate" under the plain terms of the release for Stolrow to issue a portion of the settlement payment jointly to

---

[5] More precisely, the release declares the settlement to be between Bennion, Stolrow, and others who are not relevant to this appeal, but notably, it does not list Rawlings. *See supra* ¶ 5 n.2.

Bennion and Rawlings, a lienholder. *Id.* ¶ 18. But we don't see this as a reasonable interpretation of paragraph 7's plain language.

¶22 To begin, we share the court of appeals' view that paragraph 7 reflects the parties' recognition that the settlement is or may be impacted by healthcare liens like the one held by Rawlings. After all, the opening sentence of paragraph 7 states that the settlement "is, or may be, subject to one or more . . . health care liens."

¶23 But unlike the court of appeals, we don't interpret "subject to" as meaning Stolrow could use the settlement funds promised to Bennion to satisfy such liens by unilaterally choosing to issue a portion of those funds to a lienholder. Rather, we interpret this sentence as referring to Bennion's acknowledgment—in the very next sentence—that in accepting the $150,000 settlement payment, he assumes responsibility for such liens. That is, immediately after acknowledging that the settlement "is" or "may be" "subject to one or more . . . health care liens," Bennion "expressly agrees to indemnify and save harmless" Stolrow "from any and all liability for *such* health care liens." (Emphasis added.) And to further reinforce Bennion's assumption of responsibility for all healthcare-related costs arising out of the deck incident, the remainder of paragraph 7 states, "*All* medical and other expenses and losses incurred by Weston Bennion, past, present, and future as a result of the [deck] incident . . . shall be Weston Bennion's *own* responsibility. *The consideration paid to Weston Bennion for this release is intended to cover all such expenses or losses.*"[6] (Emphases added.)

¶24 Far from being silent about which party would bear responsibility for healthcare liens arising out of the deck incident, paragraph 7, read in its entirety, shows that the parties agreed that Bennion would be responsible for any such liens. Thus, no language in the release suggests that the parties intended Stolrow to unilaterally designate a portion of the $150,000 settlement funds to satisfy such liens.

¶25 Had Stolrow wanted to satisfy Rawlings' lien as part of his settlement with Bennion, Stolrow could have negotiated for that. But where the release—as drafted by Stolrow—makes no mention

---

[6] In paragraph 8 of the release, Bennion repeats his promises to indemnify Stolrow and to hold him harmless. Bennion further promises to defend Stolrow in any action brought against him. *See supra* ¶ 7.

of Rawlings and includes Bennion's express acknowledgment that, in consideration of $150,000, he assumes responsibility for any existing or future liens, we cannot reasonably interpret the release as allowing Stolrow to deprive Bennion of exclusive ownership of those funds for the purpose of satisfying Rawlings' lien.

¶26   In reaching the opposite conclusion, both the district court and the court of appeals expressed some concern over the potential exposure Stolrow faced if the release did not allow Stolrow to use some portion of the settlement funds to satisfy Rawlings' lien. The district court observed that although Bennion "is totally, absolutely responsible for indemnifying" Stolrow, Stolrow may still be left "in a position where . . . [he] get[s] sued by Rawlings because Rawlings can't collect from [Bennion]." And the court of appeals surmised that if "the Rawlings claim remained unpaid," Rawlings "could instead bring an action against Stolrow . . . directly." 2022 UT App 93, ¶ 17.

¶27   Yet we need not speculate about what might happen and decide what rights Rawlings would have to recover from Stolrow should Bennion fail to honor his obligations under the release. Instead, all we must decide is the meaning of the release. And, as explained above, we conclude that Stolrow agreed to pay Bennion $150,000 in settlement of his claims and that Bennion, in exchange, agreed to release his claims against Stolrow, indemnify him, and hold him harmless from any liens or subrogation claims arising out of the deck incident.

¶28   Where, as here, no one has argued that this arrangement is unconscionable or a product of "fraud, duress, or misrepresentation," we must enforce the parties' agreement as they have made it, not as we think it should have been made. *Strohm v. ClearOne Commc'ns, Inc.*, 2013 UT 21, ¶ 43, 308 P.3d 424 (cleaned up); *see also Kiernan Fam. Draper, LLC v. Hidden Valley Health Ctrs., LC*, 2021 UT 54, ¶ 27, 497 P.3d 330 ("We enforce agreements as written." (cleaned up)). Certainly, if Stolrow harbored concern that Bennion could not satisfy the obligations he expressly assumed under the release, he could have tried to negotiate a different bargain. But we will not relieve a party from the agreement it made simply because we think a different bargain, with potentially less

exposure, could have been struck.[7] *See Hal Taylor Assocs. v. Unionamerica, Inc.*, 657 P.2d 743, 749 (Utah 1982) ("It is a long-standing rule in Utah that persons dealing at arm's length are entitled to contract on their own terms . . . .").

## CONCLUSION

¶29 The plain language of the release provides for a $150,000 payment to Bennion. It does not contemplate sharing those funds with a third-party lienholder. Instead, it makes express that Bennion assumes responsibility for any and all healthcare liens arising from the deck incident. Given these terms, the parties' agreement did not permit Stolrow to issue a portion of the funds jointly to Bennion and Rawlings to satisfy Rawlings' healthcare lien. We reverse and remand.

---

[7] Stolrow cites *Transamerica Insurance Co. v. Barnes*, 505 P.2d 783 (Utah 1972), and *Hill v. State Farm Mutual Automobile Insurance Co.*, 765 P.2d 864 (Utah 1988), *overruled on other grounds by Sharon Steel Corp. v. Aetna Casualty & Surety Co.*, 931 P.2d 127 (Utah 1997), as cases that, in Stolrow's view, "clear[ly] instruct[]" a tortfeasor to pay a third-party claimant directly. In his briefing, Stolrow argues that this caselaw "is relevant only in that it further confirms [Stolrow's] performance was reasonable." Stolrow revised his view during oral argument, asserting that the caselaw is also "part of the contract."

Assuming our subrogation caselaw applies to Rawlings' healthcare lien, Stolrow misinterprets this authority. In *Barnes* and *Hill*, we did not mandate that a tortfeasor pay a third-party claimant directly. All we indicated is that subrogation claims will survive settlement in certain circumstances and, when they do, a tortfeasor best protects its rights by issuing two checks rather than one. *See Barnes*, 505 P.2d at 787; *Hill*, 765 P.2d at 867. But this was only a suggestion. As explained above, parties are free to contract on their own terms. Stolrow could have followed our suggestion in *Barnes* and *Hill*, but he elected to reach a different agreement with Bennion, and we must enforce the agreement they made.