**2024 UT App 102**

# THE UTAH COURT OF APPEALS

JOHN DINSDALE HILLAM,
Appellee,
*v.*
TARA HILLAM (LOVELAND),
Appellant,
*v.*
DUSTIN HANCOCK,
Appellee.

Opinion
No. 20220488-CA
Filed July 18, 2024

Second District Court, Farmington Department
The Honorable David J. Williams
No. 174700031

Bart J. Johnsen and Alan S. Mouritsen,
Attorneys for Appellant

Julie J. Nelson, Attorney for
Appellee John Dinsdale Hillam

Joshua L. Lee, Attorney for
Appellee Dustin Hancock

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1    John Hillam and Tara Hillam were married in 2000.[1] John
filed for divorce in 2017, and John and Tara then spent several

---

1. Tara changed her last name to Loveland while the case was
proceeding below. Because the parties shared a last name for

(continued…)

years litigating various questions relating to their divorce, most of which concerned the proper distribution of their assets. The district court issued findings of fact and conclusions of law in December 2021 that resolved all remaining issues.

¶2     Tara now appeals several of the district court's rulings. We decide the various issues as follows:

- Tara first raises several challenges to the court's conclusion that, as part of this divorce, it could not divide certain assets that John had placed in an irrevocable trust (the Trust) during the marriage. We reject two of Tara's challenges for lack of preservation, and we reject a third on the merits.

- Also related to the Trust, Tara claims that the district court abused its discretion when it concluded that John had not dissipated marital assets by placing them into the Trust. We conclude that the court erred in its analysis of two of the dissipation factors, so we remand this matter for the court to reconsider the dissipation question in light of the principles set forth below.

- Finally, separate from the Trust issues, Tara argues that the court erred by not awarding her half of a stock payout that John had received after he filed for divorce. On this issue, we conclude that there was no abuse of discretion.

---

much of the case, we'll follow our usual practice and refer to both of them by their first names, with no disrespect intended by the apparent informality.

BACKGROUND[2]

*The Marriage and John's Employment*

¶3     John and Tara married in June 2000, and they had three children between 2001 and 2005. Except for occasional hairdressing jobs, Tara stopped working once the parties had children. John "earned the vast majority of the household income" during the marriage.

¶4     In August 2010, John started working for Maverik, Inc. His compensation consisted of two components: (i) salary and (ii) deferred compensation, under which John shared in a portion of the company's profits and which the parties have referred to during the litigation as "stock options" or "stock payouts."[3] "In

---

2. As explained in more detail below, this appeal challenges both (i) a ruling granting summary judgment on the issue of the validity of the Trust and (ii) findings of fact and conclusions of law that were entered after a bench trial on other matters. "When reviewing a rule 56(c) motion for summary judgment, we recite the facts in the light most favorable to the non-moving party." *Johnson v. Hermes Assocs., Ltd.*, 2005 UT 82, ¶ 2, 128 P.3d 1151. "Following a bench trial, we recite the facts from the record in the light most favorable to the findings of the trial court and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Schroeder*, 2023 UT App 57, n.4, 531 P.3d 757 (quotation simplified).

3. The parties acknowledged at trial that the references to "stock" were something of a misnomer given that they did not signify John's ownership in the company. But since this appeal does not deal with any other stock-like financial assets, we do not delve into the technical functions of the financial products at issue and will instead simply mirror the terms used by the parties when referring to the deferred compensation program.

2010 and 2011, Maverik granted [John] 1000 shares of stock options." The deferred compensation scheme changed in 2012 such that John received "stock payouts" between the years 2013 to 2017. The district court later found that the payouts made from 2013 to 2016 "presumably were used for marital expenses." John received a stock payout in 2017 after he had initiated divorce proceedings, and that payout, which was for about $570,000, was placed into John's personal bank account.

### *John Counsels with an Attorney and Creates a Trust*

¶5      In late 2012, John consulted with an attorney (Attorney) for two purposes. The first was that John and Tara were experiencing marital difficulties, so John sought assistance "with the negotiation of a postnuptial agreement." John later testified that the couple's marital difficulties during that period "were no different than what they had experienced in earlier portions of the marriage," though he acknowledged that Tara had "threatened divorce" somewhere around that time. In spite of John's discussions with Attorney about a postnuptial agreement, the couple didn't execute such an agreement.

¶6      John's second purpose in consulting with Attorney was to discuss the potential creation of a trust. John and Tara had discussed creating a trust before John met with Attorney, and Tara understood that "other Maverik executives who were starting to retire were . . . establish[ing] trusts as a means of saving money on the taxes of a stock buy-back." John asked Tara to meet with Attorney "regarding the formation of the trust." Though Tara would later testify that "she did not feel she had a choice in the matter," she also testified that "she trusted [John] and trusted that he was doing what was in the best interest of the family."

¶7      Tara met with Attorney "on one or perhaps two occasions," during which they discussed "the assets used to fund the trust." While it is not clear the extent to which Tara

understood which assets would ultimately fund the Trust, "she knew that marital assets of some kind would be used to form what she believed was a 'family trust.'" The district court later found that Tara "was not provided any draft documents to review" but that, even so, Tara did not "object[] to the formation of the trust" at the time that it was created.

¶8 The Trust (formally, the John D. Hillam 2012 Irrevocable Trust) was finalized on November 27, 2012. The Declaration of Trust and Agreement (the Trust Agreement) listed John as settlor, with Dustin Hancock as trustee (the Investment Trustee). The listed beneficiaries included, among others, John, John's "spouse," and John's "children." The Trust Agreement named Tara as the "spouse," but it then defined the term by providing:

> All references to [John's] spouse are to Tara Hillam. However, if [John] and [John's] spouse divorce after the date of this Trust Agreement, then as of the date the divorce is effective, the terms "spouse" and "[John's] spouse" shall no longer refer to Tara Hillam, and for all purposes of this Trust Agreement[,] . . . she shall be deemed to have died on the divorce's effective date.

As to the Trust's other terms, we note (for purposes of this appeal) that the Trust Agreement contained a spendthrift clause, a provision designating its situs and choice of law as Nevada, and various terms rendering the Trust irrevocable.

¶9 On the same day the Trust was finalized, John transferred his rights in the 1,000 shares of Maverick stock options that he had received in 2010 and 2011 to the Trust as a gift, and those options were valued at $350,000.

*Divorce Proceedings*

¶10 John filed for divorce in January 2017. What followed was, as later described by the district court, a "high conflict" multi-year divorce case. We recount just the proceedings from the district court that are relevant to this appeal.

¶11 John and Tara appeared before a domestic relations commissioner in March 2017, after which the commissioner entered temporary orders (the Temporary Orders). The Temporary Orders allotted custody and parent-time, assigned temporary alimony and child support, and awarded certain property for the duration of the divorce proceedings. Notably, the Temporary Orders "imputed" John with a gross monthly income of $29,792.

¶12 In November 2017, the parties met for a so-called "4-903 Settlement Conference" (the Settlement Conference).[4] At that conference, the commissioner bifurcated the divorce proceedings, mostly for purposes of reserving certain issues that had arisen regarding the Trust for future proceedings. But the corresponding order also reserved "[a]ll other objections or issues not addressed below." It emphasized that "[b]y entering this partial order, neither party has, or intends to, abandon any agreement or stipulation reached and placed on the record following the 4-903 Settlement Conference." This order superseded the Temporary Orders and entered new amounts for child support and alimony payments, but it did not detail what income figures those determinations were based on.

---

4. This type of proceeding is held in conjunction with a "custody evaluation," and it "provide[s] the court with information it can use to make decisions regarding custody and parenting time arrangements that are in a child's best interest." Utah R. Jud. Admin. 4-903(1).

¶13    The next month, Tara submitted a proposed Bifurcated Decree of Divorce. The district court apparently believed that the terms contained in this proposal had been agreed to by both parties, so it soon signed and entered this as the Bifurcated Decree of Divorce (the First Decree). John almost immediately filed a motion under rule 60(b) of the Utah Rules of Civil Procedure, wherein he asked the court to set aside the First Decree. In this motion, John alleged that the parties had not actually agreed to its terms and that Tara had engaged in "objectionable conduct" by submitting the proposed decree to the court.

¶14    Around the same time, John filed an amended divorce petition (the Amended Petition). The Amended Petition added a new claim in which John requested a declaration from the court that the Trust was valid and enforceable. The Investment Trustee was notified of this and was subsequently involved in proceedings on behalf of the Trust. Tara later answered the Amended Petition, and in her answer, she denied that the Trust was valid or enforceable.

¶15    The court later set aside the First Decree, and in December 2018, it entered an Amended Bifurcated Decree (the Second Decree) that reflected a stipulation by the parties. The Second Decree reiterated many of the same terms concerning custody, parent-time, child support, alimony, and the division of property that were present in the First Decree, but it now included a broader list of reserved issues. Specifically, it outlined that "the main remaining issue is a complex trust issue," and it also reserved the allocation of attorney fees, as well as "issues, objections, and defenses" raised following the Settlement Conference. The Second Decree established the "valuation date for marital and/or trust property" as June 13, 2018.

*The Trust's Motion for Summary Judgment*

¶16  In March 2020, the Investment Trustee filed a motion for summary judgment on the portion of the Amended Petition relating to the Trust. The Investment Trustee asked the court to rule that "the undisputed facts demonstrate that the Trust is valid and enforceable, and is not subject to division as part of the divorce." As part of this motion, the Investment Trustee noted that, a month earlier, John had renounced his rights in the Trust as both settlor and beneficiary. In light of this renunciation, the Investment Trustee argued that John no longer had any "right to receive any Trust proceeds." From this, the Investment Trustee argued that the Trust's assets were no longer the property of John or Tara, so those assets were not subject to equitable division in the divorce proceedings.

¶17  Tara opposed the Investment Trustee's motion. Tara argued that the Trust was not validly created because it was "initially funded by an invalid conveyance" and that John "had no right to unilaterally convey the sole asset of the Trust." In passing, she then simply asserted that because the "Trust is invalid, [John] had nothing to renounce rights to."

¶18  The district court granted the Investment Trustee's motion for summary judgment. The court first ruled that questions about the creation of the Trust were governed by Nevada law and that, under Nevada law, the Trust was validly created. But the court then ruled that remaining questions, such as those about its enforceability or administration, were governed by Utah law. Turning to the various questions raised by the parties about the potential division in this divorce case of the Trust's assets, the court first concluded that the stock options that had been placed into the Trust were marital property but that the "law precludes consideration of what may have been a marital asset that was placed in an irrevocable [t]rust." In the court's view, since a "title-holder has the power to dispose of [marital] property during the

marriage as he or she sees fit, and without consent of the other spouse, or even over the disapproval of the other spouse," Tara could not show the Trust was improperly funded since the stock options were in John's name at the point of transfer. Of some note for this appeal, the court further observed that Tara had "not made a claim that public policy would override the Utah Uniform Trust Code if the Trust [was] deemed valid and irrevocable." Since Tara failed to show how the Trust's assets qualified as divisible for purposes of this divorce, the court granted summary judgment in favor of the Investment Trustee.[5]

### Trial and the Third Divorce Decree

¶19   The court later held a three-day bench trial to address the issues left unresolved by the Second Decree. The parties litigated a number of issues. Of note for this appeal, Tara raised two particular issues. First, she argued that although the court had previously ruled that it could not divide the assets in the Trust, it should still award her (as part of its division of the marital estate) half of the value of the Trust's assets because John had allegedly dissipated marital assets when he first placed the stock options into the Trust. Second, Tara asked the court to award her half of the 2017 stock payout because the proceeds had been generated during the marriage.

¶20   In response, John denied that the transfer of stock options into the Trust qualified as dissipation. John also argued that the

---

5. The district court certified this as a final order pursuant to rule 54(b) of the Utah Rules of Civil Procedure. Tara then appealed. On appeal, we concluded that the rule 54(b) certification was flawed and thus dismissed the appeal. *See Hillam v. Hillam*, 2022 UT App 24, ¶¶ 15–20, 507 P.3d 380. But we expressly contemplated that Tara could still challenge the district court's summary judgment ruling in an appeal from a final judgment in the divorce case. *Id.* ¶ 25.

court should not award Tara half of the value of the 2017 stock payout because that value had previously been accounted for as income during earlier proceedings in the case.

¶21 The court subsequently issued findings of fact and conclusions of law, followed by a Supplemental Bifurcated Decree of Divorce (the Third Decree). With respect to the dissipation and 2017 stock payout issues, the court ruled as follows.

¶22 **Dissipation.** On the alleged dissipation of marital assets, the court considered the five factors described in *Rayner v. Rayner*, 2013 UT App 269, ¶ 19, 316 P.3d 455 (numerals added): "(1) how the money was spent, including whether funds were used to pay legitimate marital expenses or individual expenses, (2) the parties' historical practices, (3) the magnitude of any depletion, (4) the timing of the challenged actions in relation to the separation and divorce, and (5) any obstructive efforts that hinder the valuation of the assets."

- On the first factor, the court concluded that the "corpus of the Trust" was "indisputably marital property." The court recognized that "the parties were experiencing marital strife" at the time the Trust was created, but it thought it "unclear whether any marital problems that were being experienced at the time were different than marital problems the parties had experienced prior to October 2012." But the court then found that it was "undisputed" that the purpose of the Trust was "to avoid tax consequences," which it regarded as a legitimate marital purpose, and it further found that "neither party ha[d] received any direct benefit from the Trust"—i.e., that neither of them had "requested or received any distribution from the Trust." From all this, it concluded that the first factor weighed against dissipation.

- The court concluded that the second factor also weighed against dissipation because, although the "parties had not created a trust prior" to this one, they had previously done "what they could do to avoid tax consequences."

- On the third factor, the court determined that the magnitude of depletion was a neutral factor because, although the funds were no longer available to Tara, they still existed within the Trust and "continue[d] to grow."

- On the fourth factor, the court again acknowledged that John and Tara were having marital problems at the time of the Trust's formation, but it nevertheless concluded that "those issues apparently resolved because the parties' separation did not occur until approximately five years later." As a result, it concluded that this factor weighed against dissipation.

- Finally, the court concluded that the fifth factor "weigh[ed] heavily" against dissipation. The court was not convinced by Tara's characterization that the Trust "was created clandestinely and against her wishes," instead finding that there was "no evidence that . . . details were hid" from Tara and that "she did not take affirmative action to learn" about the Trust's details either.

In short, because the court concluded that none of the factors weighed in favor of dissipation, it rejected Tara's request for a determination that John had dissipated marital assets.

¶23    **Stock payout.** The court also rejected Tara's request for a division of the 2017 stock payout as part of the marital estate. In explaining this decision, the court found that at the temporary orders hearing, John had agreed "to be imputed a higher income to account for the 2017 stock payout." As a result, it found that John had been "required to pay more in alimony and child support than he otherwise would have had to pay," and it further

found that John had remained current on those payments. The court referenced the figures calculated in both the Temporary Orders and the Settlement Order in conjunction with this finding. The court then concluded that, "in equity," it would not award any of the 2017 stock payout to Tara because "the evidence indicates that the parties already agreed on how this payout should be addressed."

## ISSUES AND STANDARDS OF REVIEW

¶24 Tara appeals the Third Decree and "all subsidiary orders," including the ruling granting the Investment Trustee's request for summary judgment. In response to Tara's appeal, the Investment Trustee has filed a brief and presented argument on the issues relating to the summary judgment ruling, while John has briefed and presented argument on the issues relating to the distribution of the marital estate.

¶25 With respect to the summary judgment ruling relating to the Trust, Tara raises several challenges to the court's conclusion that it could not divide the assets in the Trust as part of its division of the marital estate. The question of whether a district court "appropriately granted summary judgment is a question of law," and in assessing that decision, we review the court's "legal conclusions for correctness." *11500 Space Center LLC v. Private Cap. Group Inc.*, 2022 UT App 92, ¶ 33, 516 P.3d 750 (quotation simplified). The question of whether a trust is valid also presents "a legal question, which we review for correctness." *Wittingham, LLC v. TNE LP*, 2020 UT 49, ¶ 13, 469 P.3d 1035 (quotation simplified).

¶26 Tara next challenges the court's determination (entered after trial) that John did not dissipate marital assets when he transferred stock options into the Trust. We've previously treated a district court's ruling on a dissipation question as being part of

its ruling about how to value the marital estate. *See, e.g., Clark v. Clark*, 2023 UT App 111, ¶¶ 25–26, 537 P.3d 633; *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶¶ 37, 39, 507 P.3d 385, *cert. denied*, 525 P.3d 1259 (Utah 2022); *Rayner v. Rayner*, 2013 UT App 269, ¶ 4, 316 P.3d 455. So viewed, a "district court has considerable discretion considering property division in a divorce proceeding[;] thus its actions enjoy a presumption of validity, and we will disturb the district court's division only if there is a misunderstanding or misapplication of the law indicating an abuse of discretion." *Clark*, 2023 UT App 111, ¶ 18 (quotation simplified). "Legal errors, such as the incorrect interpretation of a statute or the application of an improper legal standard, are usually an abuse of discretion." *State v. Forbush*, 2024 UT App 11, ¶ 21, 544 P.3d 1 (quotation simplified), *cert. denied*, -- P.3d -- (Utah 2024). And to the extent that any of the court's discretionary decisions turned on subsidiary factual determinations, "we defer to the trial court's underlying findings of fact, which shall not be set aside unless clearly erroneous." *Marroquin v. Marroquin*, 2019 UT App 38, ¶ 12, 440 P.3d 757 (quotation simplified).

¶27 Finally, Tara challenges the court's decision not to award her half of the 2017 stock payout. This, too, constitutes a challenge to the court's division of the marital estate. As a result, the district court possesses "considerable discretion" in making this decision, "its actions enjoy a presumption of validity," and we will disturb the court's decision "only if there [was] a misunderstanding or misapplication of the law indicating an abuse of discretion." *Clark*, 2023 UT App 111, ¶ 18 (quotation simplified).

ANALYSIS

I. Issues Relating to the Trust

¶28 Tara argues that the stock that John placed into the Trust should have been divided as part of the marital estate, and she

gives us three primary grounds for reaching this result. For the reasons set forth below, we decline to address two of these grounds because they are unpreserved. We conclude that Tara at least arguably preserved a third ground, but we reject this argument because it is foreclosed by the district court's unchallenged findings.[6]

## A.   Creditor Rights Under Section 75-7-505

¶29   As noted, John was the settlor of the Trust. Tara now argues that, because John and Tara were contemplating divorce when the Trust was created, Tara became his creditor. As a result, Tara claims that she is authorized to "reach the maximum amount that can be distributed to or for the settlor's benefit" (in this case, the full value of the Trust) under Utah Code section 75-7-505(2)(a). In response, however, the Investment Trustee first argues that Tara failed to preserve this argument. The Investment Trustee also argues that Tara is wrong on the merits. We decline to consider the merits of Tara's assertion because we agree with the Investment Trustee that this presents a distinct issue that was not preserved below.

¶30   "Under our adversarial system, the parties have the duty to identify legal issues and bring arguments," and if they fail to raise an issue at the appropriate time, "they risk losing the

---

6. The Trust Agreement had a choice-of-law provision stating that the Trust was governed by the Spendthrift Trust Act of Nevada. But even so, we agree with the district court that, with the exception of questions relating to the creation of the Trust, Utah law applies to questions regarding the enforcement of its terms. *See Dahl v. Dahl*, 2015 UT 79, ¶ 27, 459 P.3d 276 ("Because Utah has a strong policy of equitable distribution of marital assets, we decline to enforce the Trust's choice-of-law provision on the grounds that doing so would deny the district court the ability to achieve an equitable division of the marital estate.").

opportunity to have the court address that issue." *State v. Johnson*, 2017 UT 76, ¶ 14, 416 P.3d 443. "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *Id.* ¶ 15 (quotation simplified). "To provide the court with this opportunity, the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Horne v. Horne*, 2022 UT App 54, ¶ 10, 511 P.3d 1174 (quotation simplified). "Although new arguments, when brought under a properly preserved issue or theory, do not require an exception to preservation, an argument based upon an entirely distinct legal theory is a new claim or issue and must be separately preserved." *True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 32, 427 P.3d 338 (quotation simplified).

¶31 The "two primary considerations underlying" the preservation rule are "judicial economy and fairness." *Patterson v. Patterson*, 2011 UT 68, ¶ 15, 266 P.3d 828. "Our preservation rule promotes judicial economy in that it, among other things, encourages parties to resolve their controversies at the trial level, allows the trial judge to correct errors at the trial level, establishes a comprehensive record for appeal, and helps alleviate the otherwise heavy burden on appellate courts." *Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 32, 507 P.3d 357 (quotation simplified); *see also Patterson*, 2011 UT 68, ¶ 15 (concluding that the rule furthers judicial economy, in part, by ensuring that the district court is given the "opportunity to address the claimed error, and if appropriate, correct it," thereby "avoid[ing] unnecessary appeals and retrials" (quotation simplified)). And the preservation rule also promotes fairness between the parties in the sense that "if no objection was made in the trial court, the adverse party would not be compelled to overcome the objection by presenting a rebuttal, providing an alternative argument, establishing an alternative defense, or introducing new evidence in an effort to overcome such an objection." *Kelly*, 2022 UT App

23, ¶ 32 (quotation simplified). "By extension, that party would be restricted from introducing new evidence, defenses, and factual arguments in an appellate court in order to rebut or defend an unpreserved issue." *Id.* (quotation simplified).

¶32 Here, we conclude that Tara's assertion regarding the potential applicability of Utah Code section 75-7-505(2)(a) presents "an entirely distinct legal theory" that needed to be preserved below. *True*, 2018 UT App 86, ¶ 32 (quotation simplified).

¶33 Consider first the nature of Tara's proposed theory. In her brief, Tara argues that "[w]ith respect to an irrevocable trust . . . a creditor may reach the maximum amount that can be distributed to or for the settlor's benefit." To support this, she relies on Utah Code section 75-7-505(2)(a). And her proposed application of this particular statute to this case turns on several proposed subsidiary conclusions. First, Tara argues that she is a creditor; to support this, Tara cites caselaw suggesting that "a debtor-creditor relationship is created between husband and wife once divorce is threatened." *See Porenta v. Porenta*, 2017 UT 78, ¶ 19, 416 P.3d 487; *Bradford v. Bradford*, 1999 UT App 373, ¶¶ 14–16, 993 P.2d 887. Next, Tara argues that although John renounced his rights as a settlor and beneficiary of the Trust, this renunciation was invalid. But in making this argument, Tara advances a series of arguments based on language from the Trust Agreement, Utah caselaw, Nevada trust law, and even federal property law. From this, she argues that John never validly renounced his rights to assets within the Trust and that she remains his creditor.

¶34 This is a fairly intricate theory, and it turns on a combination of statutes and cases and contractual language that involves several distinct analytical frameworks. Given this, we conclude that this theory presents an issue, not an argument, and it therefore needed to be preserved below.

¶35 Reviewing the record, we agree with the Investment Trustee that this issue was not preserved. It's true that the district court grappled with the overarching question of "whether or not the corpus of the Trust [was] marital property." It's also true that Tara included citations to *Dahl v. Dahl*, 2015 UT 79, 459 P.3d 276, in her pleadings below, and *Dahl* did explore the interplay of marital estate distribution and trust law, *see id.* ¶¶ 22–27. But Tara's arguments at the summary judgment stage focused on two particular theories: first, that the Trust was not "validly created" because marital assets were placed into the Trust "without [Tara's] knowledge or consent"; and second, that, even if the Trust was validly created, Tara's "entitlement to her fair share of the marital assets" and John's "inequitable conduct" provided the court with sufficient justification to reform the Trust in such a way that she should receive a share of the stock options that were now owned by the Trust.

¶36 The district court's reasoning directly responded to these two arguments. On the first, which the court described as a "narrow" argument, the court concluded that "even when property titled in the name of one spouse is considered marital property, the title-holder has the power to dispose of that property during the marriage as he or she sees fit, and without consent of the other spouse, or even over the disapproval of the other spouse." From this, the court deemed the Trust to be "valid and enforceable." On the second, the court declined Tara's invitation to reform the Trust because application of that equitable remedy requires evidence of mutual mistake or ignorance coupled with fraud, and the court did not find sufficient evidence of those conditions. Based on these determinations, the court concluded that while the stock options were marital property, they were not subject to equitable distribution because marital property placed in an irrevocable trust "is no longer considered marital property subject to equitable distribution, but rather, the trust is a separate entity."

¶37    We see no place in Tara's pleadings or in the court's analysis where anyone invoked Utah Code section 75-7-505(2)(a), which provides the analytical foundation for the issue Tara is presenting on appeal. Although formal citation to a particular statute might not always be required to preserve an issue, it would be the usual and presumptive starting place if an assertion is predicated on a particular statute. Without such a citation, Tara would have at least been required to present this "distinct legal theory," *Johnson*, 2017 UT 76, ¶ 14 n.2, to "the district court in such a way that the court [had] an opportunity to rule on it," *id*. ¶ 15 (quotation simplified). But we see no place where she made the particular debtor-creditor argument that she's now making on appeal. We therefore regard it as unpreserved. And as a result, we decline to consider it.[7]

---

7. At oral argument, Tara suggested that her reliance on *Dahl* below was, itself, enough to preserve this new issue given the alleged similarity between her proposed issue and the issues considered by the supreme court in that case. We disagree. In *Dahl*, the supreme court held that although the wife in question was not a named settlor of the trust, she retained the rights of a settlor because she had contributed her interests in the marital property to the trust. 2015 UT 79, ¶¶ 27, 36–37. The supreme court then determined that, under Utah law, the trust was a revocable trust because the trust agreement reserved the right of settlors to amend any terms of the trust. *Id*. ¶ 29. From these conclusions, the supreme court analyzed the wife's "rights in relation to a *revocable* trust" under Utah Code section 75-7-605(2). *Id*. ¶¶ 33, 38 (emphasis in original). And the supreme court then concluded that because the wife was a settlor of what it now regarded as a revocable trust, the wife had the right to "revoke that portion of the [trust] funded with either her separate or marital property." *Id*. ¶ 38.

(continued…)

B.     Public Policy

¶38     Tara next asks us to conclude that the Trust is void as being against public policy. In support of this assertion, Tara points to the two factors that Utah courts consider when determining whether a contract violates public policy: "(1) whether the law or legal precedent has declared that the type of contract at issue is unlawful and absolutely void, and (2) whether the contract harmed the public as a whole—not just an individual." *Wittingham, LLC v. TNE LP*, 2020 UT 49, ¶ 24, 469 P.3d 1035 (quotation simplified).

¶39     We have no difficulty concluding that Tara again presents a distinct issue that needed to be preserved, as opposed to an argument that didn't. Of particular note, the first factor requires Tara to identify the law or laws that have "declared" that "type of contract" to be "unlawful and absolutely void." *Id*. (quotation simplified); *see also WDIS, LLC v. Hi-Country Estates Homeowners Ass'n*, 2022 UT 33, ¶ 41, 515 P.3d 432 ("Because a statement of public policy must be clear and free from doubt, a case in which we invalidated particular restrictive covenants without a broader

This is not what Tara is arguing here. Unlike the analysis set forth in *Dahl*, Tara is not arguing that she had become a settlor of the Trust, nor is she arguing that the Trust had become revocable and that she therefore had rights to its assets under Utah Code section 75-7-605(2). Rather, Tara is asserting that she had rights to its assets as a *creditor* under an entirely different statutory scheme (Utah Code section 75-7-502(2)(a)). We therefore regard Tara's theory on appeal as a distinct legal theory from that which the supreme court considered in *Dahl*. And while we don't foreclose the possibility that some court that is properly presented with this issue in the future may (or may not) find some analytical support in *Dahl*, we hold here that Tara's reliance on *Dahl* below was not sufficient, without more, to preserve the creditor-based issue that she seeks to raise in this appeal.

statement that such covenants are categorically void and incapable of ratification is insufficient." (quotation simplified)); *Eagle Mountain City v. Parsons Kinghorn & Harris, PC*, 2017 UT 31, ¶ 15, 408 P.3d 322 ("A contract will be held to violate public policy only where it violates a well-defined and dominant policy." (quotation simplified)). And again, the second factor requires Tara to show how this particular contract harmed the public, as opposed to harming just her. *Wittingham*, 2020 UT 49, ¶ 24.

¶40 Tara didn't present such a theory below. When Tara asked the court to invalidate the Trust during the litigation regarding the Investment Trustee's summary judgment motion, she did not identify any law that expressly forbade the transfer of marital assets to an irrevocable trust, nor did she assert that the Trust Agreement harmed the public as a whole. Indeed, the district court itself pointed this out in its order granting summary judgment, noting that "Tara ha[d] not made a claim that public policy would override the Utah Uniform Trust Code if the Trust is deemed valid and irrevocable." Because this is an unpreserved issue, we decline to consider it.[8]

---

8. With respect to both the creditor issue and the public policy issue, Tara suggests that, even if these issues are unpreserved, we should still address them on the merits because the principles of judicial economy and fairness would not be undermined were we to do so.

It's true that these interests support our preservation rule generally. And it's also true that our "waiver and preservation requirements are self-imposed and are therefore doctrines of prudence rather than jurisdiction." *State v. Johnson*, 2017 UT 76, ¶ 12, 416 P.3d 443 (quotation simplified). But as discussed above, the preservation rule itself is designed to protect interests of judicial economy and fairness by, among other things, incentivizing parties to raise issues in the first instance in the

(continued…)

### C. Transfer Made in Contemplation of Divorce

¶41 Finally, Tara asks us to adopt something of a new common law rule under which assets that are placed by a spouse into a trust during a marriage can be equitably distributed in a subsequent divorce if the transfer was effectuated "in contemplation of divorce or with the intent of impairing marital rights."

¶42 As with the creditor and public policy issues discussed above, the Investment Trustee asserts that this issue was not preserved. But unlike those issues, there is some reason to think that this issue was preserved. In her opposition to the motion for summary judgment, Tara argued that "one spouse is not entitled to shield marital assets from another spouse by use of a trust," and she further complained that John acted "without [her] knowledge or consent and with the clear intent to deprive her of her interest in marital property."

¶43 The Investment Trustee nevertheless asserts that these statements were insufficient to establish preservation. But we need not definitively decide whether Tara sufficiently preserved this issue. If "the merits of [the] claim can easily be resolved in favor of the party asserting that the claim was not preserved, we

---

district courts (thereby allowing a speedier and less expensive resolution of cases), as well as by protecting the other party in the case from being confronted with an issue for the first time on appeal (and, as a result, being hamstrung in its ability to either respond or instead make tactical or strategic adjustments). For these and other reasons, we've recently held that the plain error exception to preservation is unavailable in most civil cases. *See Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 41, 507 P.3d 357. We decline to accept Tara's invitation to essentially create a new and potentially amorphous preservation exception here.

readily may opt to do so without addressing preservation." *State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (emphasis omitted). And in practice, we've often done so where the preservation question is somewhat murky but the merits question is not. This is the case here.

¶44 Again, Tara's proposed rule turns on the spouse's reasons or intent for transferring the marital property. But the "determination of intent is a question of fact, which will only be reversed if the district court's finding is clearly erroneous." *Bonnie & Hyde, Inc. v. Lynch*, 2013 UT App 153, ¶ 13, 305 P.3d 196 (quotation simplified). In its posttrial findings of fact, the court observed that the "CPA for the couple while they were married . . . testified that such trusts are very common because they create estate tax savings—in essence, the formation of the trust removes any appreciation of the trust proceeds from the estate/death tax." The court further observed that Tara had "testified at the [t]rial that she understood that one of the benefits of the trust was to avoid tax consequences." The court reiterated and relied on this testimony by Tara and the CPA later in its dissipation analysis, finding that it was "undisputed that the Trust was formed to avoid tax consequences when the beneficiaries withdrew funds from the Trust."

¶45 Tara has not directly challenged this finding in her brief, much less carried her burden of establishing that it was clearly erroneous. In any event, to satisfy that burden of persuasion on this point, Tara would need to marshal the evidence, and we see nowhere in her brief where she has done so. *See State v. Cecala*, 2021 UT App 141, ¶ 30, 502 P.3d 790 ("Failure to marshal does not result in procedural default, but a party challenging a factual finding . . . will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal." (quotation simplified)). And this finding directly undermines Tara's proposed resolution of this issue. After all, if the purpose of the Trust was to avoid tax consequences, then Tara would not be

entitled to relief even under her proposed rule. As a result, we conclude that, potential preservation concerns aside, Tara is not entitled to the requested relief.[9]

## II. Dissipation of Marital Assets

¶46 Tara next argues the district court erred in determining that John did not dissipate marital assets when he transferred the stock options to the Trust. Utah courts consider several factors in

---

9. The Investment Trustee argues that because Tara has raised a "plethora of unpreserved arguments," we should award the attorney fees that he incurred defending against this appeal. The Investment Trustee bases this request on rule 33(a) of the Utah Rules of Appellate Procedure, which states that "if the court determines" that an appeal was "either frivolous or for delay, it will award just damages, which may include . . . reasonable attorney fees . . . to the prevailing party." For purposes of this rule, a "frivolous appeal" or brief "is one that is not grounded in fact, not warranted by existing law, or not based on a good faith argument to extend, modify, or reverse existing law." Utah R. App. P. 33(b). "But parties seeking attorney fees under rule 33 face a high bar. The imposition of such a sanction is a serious matter and only to be used in egregious cases . . . ." *Porenta v. Porenta*, 2017 UT 78, ¶ 51, 416 P.3d 487 (quotation simplified).

We reject this request. While we have concluded that two of Tara's assertions presented unpreserved issues, Tara at least had colorable (albeit unpersuasive) reasons for asserting that she was advancing arguments, as opposed to issues (particularly with respect to her first assertion), and we thought the preservation question was close enough on her third assertion to warrant decision on the merits. On balance, we don't believe that the portion of Tara's brief to which the Investment Trustee responded rises to the level of egregiousness contemplated by rule 33(a).

determining if dissipation of marital assets has occurred, including:

> (1) how the money was spent, including whether funds were used to pay legitimate marital expenses or individual expenses; (2) the parties' historical practices; (3) the magnitude of any depletion; (4) the timing of the challenged actions in relation to the separation and divorce; and (5) any obstructive efforts that hinder the valuation of the assets.

*Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 69, 507 P.3d 385 (quotation simplified), *cert. denied*, 525 P.3d 1259 (Utah 2022). Although a district court's determination regarding a dissipation determination enjoys a "presumption of validity," *Dahl*, 2015 UT 79, ¶ 119 (quotation simplified), a district court abuses its discretion if it misapplies the law, *see Clark v. Clark*, 2023 UT App 111, ¶ 18, 537 P.3d 633. As explained below, we see no error with respect to the court's analysis of the first, second, and fourth factors, but we do see legal error in the court's analysis of the third and fifth factors.

A.     How the Money Was Spent

¶47     The first factor looks to "how the money was spent, including whether funds were used to pay legitimate marital expenses or individual expenses." *Wadsworth*, 2022 UT App 28, ¶ 69 (quotation simplified). As noted earlier, the district court made a factual finding that the purpose of the Trust was to avoid certain tax consequences. The court then echoed this finding in its analysis of the first dissipation factor, finding that it was "undisputed that the Trust was formed to avoid tax consequences when the beneficiaries withdrew funds from the Trust." These findings do indeed suggest that the assets were spent for legitimate marital purposes.

¶48 On appeal, Tara suggests that John's intent was really "to remove the assets from the marital estate." But to challenge the court's contrary finding, Tara would have to show that it is clearly erroneous, and to carry her burden of persuasion, she would need to marshal the supporting evidence. *See Cecala*, 2021 UT App 141, ¶ 30. She has not done so. In light of this unrebutted finding, we perceive no abuse of discretion in the court's conclusion that, because the Trust was formed to avoid tax consequences, the first factor did not support a dissipation determination.

B.     Historical Practices

¶49 The second factor looks to the "parties' historical practices." *Wadsworth*, 2022 UT App 28, ¶ 69 (quotation simplified). Here, the district court first noted that John and Tara "had not created a trust prior" to this one, although it also noted that they did create a different trust a short time later. Based on the fact that they had not previously created a trust, Tara argues that the second factor should have weighed in favor of dissipation.

¶50 By focusing exclusively on the couple's earlier history with trusts, Tara interprets this factor too narrowly. The district court also found that John and Tara had done "what they could do to avoid tax consequences related to the income that [John] brought into the marriage," that John and Tara had taken "other actions to avoid tax consequences (such as prepaying taxes, paying taxes quarterly, etc.)," and that they "appear[ed] to always be concerned with tax consequences regarding [John's] income." In light of these additional findings, we agree with the district court that the "historical practices" in question could include the couple's broader historical practice of trying to minimize their tax obligations. Because the court's additional findings confirm that the Trust was created for that very purpose, we see no abuse of discretion in the court's conclusion that the second factor weighed against dissipation.

C.      The Magnitude of Any Depletion

¶51     The third factor looks to the "magnitude of any depletion." *Id.* (quotation simplified). Here, the district court found that while "the marital assets that formed the corpus of the Trust are not available to [Tara] and, therefore, for her, are 100% depleted," they otherwise "still exist." From this, the court concluded that this factor did not weigh "for or against" dissipation. We disagree with the analytical framework that the court used in evaluating this factor.

¶52     The court's analysis begs the question: what's the "asset" at issue in a dissipation analysis that's conducted in a divorce case? Here, the district court viewed the "asset" as being just the stocks themselves. But we've previously recognized that dissipation occurs when a spouse "seriously depleted *the marital estate.*" *Shepherd v. Shepherd*, 876 P.2d 429, 433 (Utah Ct. App. 1994) (emphasis added); *cf. Wadsworth*, 2022 UT App 28, ¶ 72 (looking to whether the spouse had transferred the asset in question "out of the marital estate"). And it makes sense that this factor should focus on any depletion of value to the marital estate (as opposed to just looking to any depletion in value of a particular item). For example, suppose that, in contemplation of a potential divorce, a spouse surreptitiously transferred all of the funds from the couple's joint bank account into an account that only that spouse controlled. In such a situation, no one would seriously dispute that this transfer weighed in favor of a dissipation determination, even if the money itself still existed within the other, non-marital account.

¶53     The district court thus erred by looking to whether the stock options (or their value) still exist in the abstract. Rather, in considering this factor, the court should have considered the magnitude of any depletion to the marital estate.

D.     The Timing of the Challenged Action

¶54     The fourth factor looks to "the timing of the challenged actions in relation to the separation and divorce." *Wadsworth*, 2022 UT App 28, ¶ 69 (quotation simplified).

¶55     There's some reason to think this factor could have gone either way. As Tara points out, the record indicates that the parties were having marital difficulties at the time that the Trust was created. After all, one of the two reasons that John went to see Attorney was to seek assistance "with the negotiation of a postnuptial agreement," and John apparently did so because of the parties' ongoing marital difficulties. Given that John created the Trust a short time later and then transferred the stock options into it, the timing of the transfer might suggest that it was at least in contemplation of a potential separation or divorce, thus supporting a dissipation determination.

¶56     But on the other hand, we've framed this factor as looking to the "timing of the challenged actions *in relation to the separation and divorce*." *Id*. (emphasis added, quotation otherwise simplified). Taking this framing at face value, and viewing the trial testimony against it, the district court concluded that "while it appears that some marital problems existed at the time of the creation of the Trust, those issues apparently resolved because the parties' separation did not occur until approximately five years later." The court thus concluded that this factor "weigh[ed] against a finding of dissipation."

¶57     In *Clark*, one of the parties asked us to impose more rigidity with respect to how district courts should view this factor, but we declined the invitation. 2023 UT App 111, ¶ 29 n.2. We instead expressed our view that "the district court is in the best position to evaluate the importance of such evidence on a case-by-case basis." *Id.*

¶58 Here, we believe that the district court *could* have concluded that the timing factor supported a dissipation determination, given that the parties were experiencing marital difficulties when the transfer occurred. But we also don't believe that the court was *required* to do so, given that the parties stayed married for several more years and, also, the court's additional findings that there was an independent, tax-related purpose for the creation of the Trust and the transfer in question. In light of the discretion afforded to the district court, we see no basis for reversing its conclusion that the fourth factor did not support a dissipation determination.

E.     Obstructive Efforts

¶59 The fifth factor looks to whether there were "any obstructive efforts that hinder the valuation of the assets." *Wadsworth*, 2022 UT App 28, ¶ 69 (quotation simplified). The district court concluded that this factor "weighs heavily in favor of [John]" because "the evidence shows that, while [Tara] did not know every detail pertaining to the Trust, that was because she did not take affirmative action to learn those details and, furthermore, there is no evidence that those details were hid from [her]." In so ruling, the court suggested that it believed this factor requires some affirmative obstructive action by the allegedly concealing party. We disagree.

¶60 It's true that "obstruction" often involves an affirmative action that's intended to conceal or hide something. *See Obstruction*, Black's Law Dictionary (12th ed. 2024) (defining "obstruction" as "[t]he act of impeding or hindering something; interference"); *see also Goggin v. Goggin*, 2013 UT 16, ¶¶ 10–15, 299 P.3d 1079 (referring to a party's behavior as being "obstructionist" where, among other things, the party frustrated attempts to access documents on multiple occasions, provided voluminous and irrelevant documents, and "stonewall[ed] and alter[ed] . . . requested computer evidence" (quotation simplified)).

¶61 But context of course matters. *Wadsworth*, 2022 UT App 28, ¶ 74 (holding that the "mere failure to disclose [an] investment" did "not mandate a finding" of obstruction). And here, we're not interpreting a particular statute (such as a criminal obstruction of justice statute), wherein the term "obstruction" might have a defined meaning that may or may not require an affirmative act. Rather, we're interpreting the phrase "obstructive efforts" as it has been used in a common law test that applies to a divorce action.

¶62 Viewed through the particular prism of how marriages sometimes or even often operate—both in terms of trust expectations and agreed-upon divisions of labor—we believe that it sometimes might be possible for a spouse to impede or hinder the other spouse's awareness of something (even something important) through half-truths or targeted omissions alone. If supported by the facts and evidence, it thus might be possible for a court to determine that half-truths or omissions qualify as "obstructive efforts" for purposes of a dissipation analysis.

¶63 Here, the record does show that Tara was included in some meetings in which John and Attorney discussed the formation of the Trust with her, and it likewise shows that she could have accessed and read the Trust Agreement or other documents related to the Trust if she had made the effort. But the record also indicates that Tara "was not provided any draft documents to review . . . prior to this divorce case." And of more importance, it shows that she was told by John that the Trust was to be "a family trust" for the purpose of "avoid[ing] tax consequences" and that she was told that she was a beneficiary. It also shows that, while John was apparently taking the lead on the creation of the Trust and even making representations to her about it, Tara was not told that her status as the "spouse" and beneficiary of what had been described to her as a "family trust" would be nullified if the parties ever divorced.

¶64     Like the other factors, this factor involves a case-specific inquiry that's best determined by the district court in the first instance. And our disagreement with the district court is not necessarily with the outcome of its resolution of this factor. Rather, our disagreement is with the court's apparent conclusion that this factor can be satisfied only through affirmative misstatements, as opposed to omissions that could have been regarded as material—either in light of the couple's past practices generally or the particular circumstances of how they were approaching the creation of the Trust. On remand, we leave it to the district court to assess this factor anew in light of the principles set forth above.

¶65     Turning to the broader question of whether John's conduct supported a dissipation determination, we likewise stress that this ultimate determination is also best made in the first instance by the district court. *See, e.g., Clark*, 2023 UT App 111, ¶ 29 n.2 (recognizing that "timing" is "one factor among many" and that a district court has "flexibility" to "consider all the circumstances in a particular case"); *Wadsworth*, 2022 UT App 28, ¶ 76 (concluding that although "the timing of the transfers *could* provide circumstantial evidence of dissipation," the court did not abuse its discretion in rejecting the dissipation argument where "the parties' historical practices and the lack of additional evidence suggesting obstructive intent . . . support[ed] the court's determination that the transfers were not dissipation").

¶66     Because we have concluded that the court erred in its assessment of two of the dissipation factors, we remand for the district court to reconsider this question in light of the principles set forth in this opinion. If the court concludes that John did dissipate the marital estate, Tara "should receive a credit for . . . her share of the assets that were dissipated." *Rayner v. Rayner*, 2013 UT App 269, ¶ 20, 316 P.3d 455 (quotation simplified).

## III. The Stock Payout

¶67 Finally, separate from the issues relating to the Trust, Tara argues that "the district court abused its discretion in declining to award [Tara] her share of the $570,000 payout" that John received in 2017, "while the parties were still married." In Tara's view, this payout should have been treated as an asset (and, thus, should have been divided as part of the marital estate), rather than as income.

¶68 As noted above, however, a "district court has considerable discretion considering property division in a divorce proceeding," and its actions "enjoy a presumption of validity." *Clark*, 2023 UT App 111, ¶ 18 (quotation simplified); *see also Rothwell v. Rothwell*, 2023 UT App 50, ¶ 89, 431 P.3d 225, *cert. denied*, 537 P.3d 1011 (Utah 2023) (holding that a district court had "significant discretion" when determining whether to count "income-producing property" as income or, instead, to treat it as an asset). Indeed, Tara's own framing reflects that the decision in question here was discretionary, with Tara asking us to hold that the "district court abused its discretion."

¶69 In light of the particular circumstances of this case, we see no abuse of discretion. In its posttrial ruling on this issue, the district court acknowledged that John had received "approximately $570,000" as a stock payout in 2017 and that John had maintained control of those funds. But the court then credited "evidence indicat[ing] that, during negotiations at the temporary orders hearing," John "agreed to be imputed a higher income to account for the 2017 stock payout." The court noted that, "[a]s a result [of the] higher imputed income," John "was required to pay more in alimony and child support than he otherwise would have had to pay" and that John "has remained current on all required payments." The court then concluded that, "*in equity*," it would not award any of the 2017 stock payout to Tara because "the

evidence indicate[d] that the parties already agreed on how this payout should be addressed." (Emphasis added.)

¶70  In challenging this decision, Tara claims that "there is no evidence that the parties intended to include the 2017 stock payout of $570,000 in [John's] imputed income at the Temporary Orders phase." But this is not correct. At trial, John acknowledged under oath that he had "stipulated to a higher income amount at the temporary orders hearing . . . to account for deferred compensation." In its ruling, the district court thus appears to have credited this testimony.

¶71  Tara has not persuaded us that the court committed any error in crediting that testimony, nor has she shown that the temporary orders did not, in fact, impute a higher income to John as a direct reflection of this stock payout. And with that as the backdrop, we see no abuse of discretion in the court's decision to continue treating this as income for purposes of its final resolution of this case. After all, the temporary orders in question were entered in March 2017, and the posttrial ruling was entered in December 2021. Thus, when the court ultimately ruled on this issue after trial, two things were apparent: (1) Tara had previously agreed that this payout should be treated as income, and (2) as a direct result of that agreement, Tara had received higher alimony payments and John had paid more in child support for almost five years while the case was being litigated. If the court were to reverse course at that point and treat this as an asset, this decision could result in a series of new inequities.[10]

---

10. As John points out in his brief, for example, he presented evidence at trial indicating that, after receiving this payout, he used a very large percentage of it to pay outstanding expenses, many of which were marital expenses. Thus, if the district court had accepted Tara's invitation to change course and treat this

(continued…)

¶72 Considering these particular circumstances, we conclude that the court did not abuse its "considerable discretion," *Clark*, 2023 UT App 111, ¶ 18 (quotation simplified), when it decided that it would continue to honor the parties' earlier agreement and treat the stock payout as income, as opposed to treating it as an asset. And from there, we further note that Tara's challenge on appeal was simply directed at *how* this payout should be treated (i.e., whether to treat it as income or instead as an asset). Tara has not separately attempted to demonstrate (much less with adequate briefing) that, if the payout were properly treated as income, the court erred in assessing its impact on John's child support or alimony obligations. As a result, she has not persuaded us that there was any reversible error with respect to how the court resolved this payout within the context of the couple's divorce.

CONCLUSION

¶73 Tara failed to preserve many of her issues relating to the disposition of the Trust, and on the remaining issue her claim fails on its merits. On the question of whether John's transfer of stock options into the Trust constituted dissipation, we remand for the district court to reconsider two of the five factors and then issue a new determination. And on the 2017 stock payout, we affirm the decision of the district court.

———————

payout as an asset, the ripple effects could have required the court to also determine how much of that payout was even available to be divided as an asset at all.